IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 37351-7-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARK ALLAN MILLER, | ) | OPINION PUBLISHED IN PART |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Mark Miller, a former financial advisor, appeals his convictions following a jury trial for first degree theft, first degree criminal impersonation, and attempted first degree theft. The victim was an almost 87-year-old woman who was a client of Mr. Miller's prior to his June 2016 resignation from J.P. MorganChase (Chase). After he resigned, he guided or assisted his elderly former client in withdrawing substantial financial assets, some, but not all of which, he succeeded in misappropriating.

He assigns error to an accomplice liability instruction given over his objection, challenges the sufficiency of the evidence to support the criminal impersonation and attempted theft counts, challenges the criminal impersonation conviction on double jeopardy grounds, and points out a scrivener's error in the judgment and sentence. We remand with directions to correct the scrivener's error but otherwise affirm.

FACTS AND PROCEDURAL BACKGROUND

Lillian Meador was living in the Brookdale Orchards assisted living facility in Vancouver in the summer of 2016 when she suffered an infection and was hospitalized. She was discharged for recovery in early August to Prestige Care, a nursing and rehabilitation center, where her initial assessment and care plan were assigned to Stephanie Williams, a social services director. Mark Miller, who Ms. Williams learned was Ms. Meador's financial advisor and friend, was identified as her emergency contact. Ms. Williams phoned Mr. Miller on August 15 because she wanted to set up a care conference and determine whether someone held a power of attorney for Ms. Meador.

Mr. Miller told Ms. Williams that someone did hold a power of attorney, but since that person had not been involved for many years, steps were being taken to appoint Mr. Miller as Ms. Meador's attorney-in-fact. In a conversation with Mr. Miller in Ms. Meador's room two days later, Ms. Williams again asked for the name of the existing attorney-in-fact, explaining that because Ms. Meador performed poorly on a cognitive test, Prestige needed to find someone who could assist with planning for her discharge. Mr. Miller became upset, telling Ms. Williams that he needed to be present for any cognitive testing of Ms. Meador, to make sure that the questioning was done appropriately. He provided Ms. Williams with a name of the existing attorney-in-fact but did not provide contact information, telling Ms. Williams that he would contact the

2

woman himself. Concerned that Ms. Meador might be being exploited by Mr. Miller, Ms. Williams filed a report that day with Adult Protective Services (APS).

On August 23, while at a visit at Prestige, Mr. Miller told Ms. Williams that his role as Ms. Meador's financial advisor prevented him from becoming her attorney-in-fact, but he would obtain and provide a copy of her existing power of attorney. He never did. Lacking an attorney-in-fact who could make decisions for Ms. Meador, personnel at Prestige initiated a guardianship proceeding.

In late August, Max Horn, an APS investigator, met with Ms. Meador. Ms. Meador struck Mr. Horn as confused and uncomfortable about answering Mr. Horn's questions about Mr. Miller, saying she "had to speak with Mark first." Report of Proceedings (RP) at 567. She did provide Mr. Horn with Mr. Miller's cell phone number at some point, however, and Mr. Horn phoned Mr. Miller on September 6. Mr. Horn's purpose for calling Mr. Miller was to find out where Ms. Meador banked, and Mr. Miller said he did not recall, other than that she had some funds at Chase. Mr. Miller agreed during the phone conversation to call Mr. Horn back with a phone number for the woman who held Ms. Meador's power of attorney, but he never did.

On the afternoon of September 8, Vancouver lawyer James David received a call from Mr. Miller. Mr. Miller was with Ms. Meador, who participated in the call. Mr. Miller explained that Ms. Meador was seeking legal representation to fight the guardianship proceeding commenced by Prestige. Mr. David traveled to meet with Ms.

Meador at Prestige the next day, and spoke with her without Mr. Miller present. She engaged him as counsel.

In Mr. David's second or third meeting with Ms. Meador, which took place at Brookdale following her September 12 discharge from Prestige, they opened her mail, which included two substantial checks from the Standard Insurance Company ("the Standard"), where she had held annuities. Previously, during Ms. Meador's stay at Prestige, Mr. Miller had been stopping at Brookdale to pick up her mail. Mr. David had Ms. Meador endorse the $240,000 in value of checks for deposit and arranged for them to be deposited into her bank account.

Mr. David attempted to meet with Mr. Miller twice, because he had questions about Ms. Meador's financial affairs, but Mr. Miller missed both appointments. Mr. Miller, who had visited Ms. Meador 18 times and called her room 36 times during the six weeks she was at Prestige, also stopped visiting Ms. Meador.

The investigation by APS led it to refer Ms. Meador's situation to the Vancouver Police Department. An investigation by Detective Michael Day led him to information that in August, Mr. Miller persuaded Ms. Meador to withdraw $50,000 in cash from her bank accounts with Chase and give it to Eddie Besaw, a former colleague of Mr. Miller's. Ms. Meador was led to understand that Mr. Miller was going to invest the $50,000 on her

4

behalf. Ms. Meador, who used a wheelchair, was able to travel by C-VAN[1] to a Fred Meyer store with an in-store Chase location suggested to her by Mr. Miller, but on arriving, she needed someone to push her to the bank and, following the withdrawal, take and deliver the $50,000 cash. Mr. Besaw told Detective Day that Mr. Miller engaged him to assist Ms. Meador at the bank and deliver the cash to Mr. Miller, who said he would invest it on her behalf. Mr. Besaw delivered $45,000 of the cash to Mr. Miller, reduced by $5,000 that Mr. Miller had allowed Mr. Besaw to keep for his trouble.

The detective also received information that the large checks from the Standard that Ms. Meador received in September at Brookdale were the result of a cash-out process that had been initiated by Mr. Miller. Mr. Miller had called the Standard and requested withdrawal documentation, holding himself out as Ms. Meador's nephew. His call had been recorded. The completed forms, signed by Ms. Meador but apparently completed by someone else, had been returned to Standard on September 6.

Detective Day also learned that Mr. Miller was unemployed, having resigned from Chase a couple of months earlier, and was in financial distress.

Mr. Miller was charged with first degree theft of the $50,000 withdrawn from Ms. Meador's bank accounts, criminal impersonation for the call to the Standard, and

---

[1] C-VAN is a paratransit service offered by Clark County's public transportation agency for disabled persons unable to travel on its fixed-route bus service. *See Who Is Eligible for Paratransit and Application* Process, C-TRAN, https://www.c-tran.com/c-tran-services/paratransit-service/paratransit-eligibility [https://perma.cc/35JV-9H2P].

5

attempted first degree theft for the steps taken to cash out the Standard annuities. The

State alleged three aggravating circumstances for the theft and attempted theft counts:

that the victim was particularly vulnerable or incapable of resistance, Mr. Miller used his

position of trust, confidence, or fiduciary responsibility to commit the crimes, and the

crimes were major economic offenses.

In August 2018, the case proceeded to a jury trial. In opening statements, the State

described Mr. Miller as someone financially underwater, who charmed Ms. Meador into

allowing him to assist with her finances after he left Chase. It characterized Mr. Besaw

as "a fall guy" Mr. Miller engaged to help Ms. Meador make the $50,000 cash

withdrawal and deliver the cash to him. RP at 256. The prosecutor suggested that after

Mr. Miller succeeded in causing Ms. Meador to withdraw the $50,000, he took steps to

obtain the even more substantial value of her annuities, falsely telling the Standard's

customer service representative that he was Ms. Meador's nephew and that the funds

were needed to pay her mounting medical expenses. "Fortunately," the prosecutor told

jurors, "someone intercepts those disbursement checks before they get to Mark Miller."

RP at 260.

Defense counsel responded, telling jurors in opening statement that it was Mr.

Miller who was the fall guy for Mr. Besaw's theft of $50,000 cash from Ms. Meador.

Defense counsel described Mr. Besaw as a person "who's kind of gone from career to

career trying to make something of himself." RP at 266. He said that Mr. Miller had a

referral relationship with Mr. Besaw, who sold supplemental Medicare policies and

annuities, but the relationship soured after clients referred by Mr. Miller were unhappy

with Mr. Besaw's services. He told jurors that before the referral relationship ended, Mr.

Miller had provided Mr. Besaw with Ms. Meador's name and phone number. He told

jurors "there's no question that Eddie Besaw is the one who took $50,000 cash from

Lillian Meador." RP at 270. As for the annuities, defense counsel told jurors that Mr.

Miller simply helped Ms. Meador surrender her annuities because she wanted to make

other investments, and there was no theft: "The money comes in, goes right into her bank,

done deal." *Id*.

The jury was instructed on accomplice liability over Mr. Miller's objection. The

State requested the instruction at the close of the evidence, and defense counsel argued

that the State had not charged Mr. Miller as an accomplice and "[t]hat's a different kind

of case." RP at 1269. He also argued:

> The State's theory, evidence they presented, everything presented is that
> Mr. Besaw was this unwitting guy who just went on a little errand to watch
> this woman do shopping for a little while and got $5,000 for it.
>     The evidence is he knew nothing about what Mr. Miller's plan was.
> This is just a complete shock to him. He's—we're not talking about an
> accomplice. To have an accomplice, you have to have two parties to a
> crime. We don't have that here. We have one person acting innocently, he
> was just basically the instrument of Mr. Miller. That's the State's theory.
> He's not an accomplice. You've got to have two people to have
> accomplice liability here. We've got one actor, as the State has alleged, not
> an accomplice.

7

RP at 1270.  The trial court overruled Mr. Miller's objection and gave the accomplice instruction.

The jury found Mr. Miller guilty as charged, including finding all of the aggravating circumstances charged by the State.

Mr. Miller had no criminal history.  The trial court found his standard range sentence for the most serious crime, the first degree theft, was 2 to 6 months.  It rejected a State request to impose an exceptional 120 month sentence, but did impose an exceptional sentence of 27 months.

Mr. Miller appeals.  His appeal was administratively transferred from Division Two to Division Three.

ANALYSIS

Mr. Miller makes six assignments of error.  One, to a scrivener's error, is conceded by the State.[2]  We will direct the trial court to make the necessary correction.

In the published portion of this opinion, we address Mr. Miller's challenge to the accomplice liability instruction and the sufficiency of the evidence to support the "assumption of a false identity" element of the criminal impersonation charge.

---

[2] The judgment and sentence identifies Mr. Miller's sentence for criminal impersonation as "365 months."  Clerk's Papers (CP) at 101.  The trial court intended to impose 365 days, which was the high end of the standard range.  *See* RP at 1468; CP at 99.

I.      THE TRIAL COURT PROPERLY INSTRUCTED THE JURY ON ACCOMPLICE LIABILITY

On the charge of first degree theft of the $50,000, the State wished to be able to argue that Mr. Miller could be liable as an accomplice if the jury was persuaded by the defense that Mr. Besaw was the principal. As defense counsel had told the jury in his opening statement, "There's no question that Eddie Besaw is the one who took $50,000 cash from Lillian Meador." RP at 270.

"Each party in a jury trial is entitled to have his theory or theories of the case presented to the jury by proper instructions where there is evidence to support them." *Kiemele v. Bryan*, 3 Wn. App. 449, 452, 476 P.2d 141 (1970). The trial court's choice of jury instructions is reviewed for an abuse of discretion. *State v. Hathaway*, 161 Wn. App. 634, 647, 251 P.3d 253 (2011).

The jury was instructed that to prove the charge of first degree theft, the State must show that the defendant, at the time charged and in or affecting persons in the State of Washington,

> (a) wrongfully obtained or exerted unauthorized control over property of another or the value thereof; or
>
> (b) by color or aid of deception, obtained control over property of another or the value thereof; and
>
> (2) That the property exceeded $5,000 in value;
>
> (3) That the defendant intended to deprive the other person of the property.

Clerk's Papers at 66. Adding an accomplice instruction enabled the State to argue that

Mr. Besaw rather than Mr. Miller engaged in these acts, but that Mr. Miller acted as an

accomplice. An accomplice is someone who, knowing that it will promote or facilitate

the commission of a particular crime, solicits, commands, encourages, or requests another

person to commit it, or aids or agrees to aid another person in planning or committing it.

RCW 9A.08.020(3)(a)(i)-(ii).

Mr. Miller objected to the giving of an accomplice instruction, arguing, "The

State's theory, evidence they presented, everything presented is that Mr. Besaw was this

unwitting guy who just went on a little errand." RP at 1270. That was a fair

characterization of Mr. Besaw's testimony, and Mr. Besaw was a key State witness. But

a party is not bound by the testimony of its own witness. *State v. Winters*, 54 Wn.2d 707,

708, 344 P.2d 526 (1959). It may prove or point to evidence that the facts are otherwise.

*See id.*; *accord State v. Green*, 71 Wn.2d 372, 378, 428 P.2d 540 (1967) (a party may

impeach its own witness with evidence of a contradictory nature through other

witnesses).

Throughout the trial, the State's theory was that Mr. Miller was the primarily

culpable actor, but it was faced with defense evidence and argument that Mr. Besaw

carried out the "actus reus"[3] of obtaining control of the cash. It also faced evidence and

---

[3] "Actus reus" is "[t]he wrongful deed that comprises the physical components of
a crime and that generally must be coupled with mens rea to establish criminal liability; a

argument that Mr. Besaw's claim of innocent participation was not credible. Doubt was cast on whether Mr. Besaw could reasonably have believed that Mr. Miller needed *cash* to make investments on Ms. Meador's behalf, or that Mr. Besaw's serving as Ms. Meador's wheelchair attendant explained why he should be paid $5,000. The defense also described surveillance video of Mr. Besaw and Ms. Meador as they approached the in-store bank as revealing that Mr. Besaw was wearing sunglasses and was "hiding" and "hutching down." RP at 1377. After leaving the bank, Mr. Besaw could be seen on the surveillance video tucking the $50,000 cash under his waistband.

Well-settled principles control our review of Mr. Miller's challenge to the accomplice liability instruction. One is that an information that charges an accused as a principal adequately apprises him or her of potential accomplice liability even though the information does not expressly charge aiding or abetting or refer to other persons. *State v. Trujillo*, 112 Wn. App. 390, 401, 49 P.3d 935 (2002). Another is that "[w]hen determining if the evidence at trial was sufficient to support the giving of an instruction," this court views "the supporting evidence in the light most favorable to the party that requested the instruction." *State v. Fernandez-Medina*, 141 Wn.2d 448, 455-56, 6 P.3d 1150 (2000).

---

forbidden act <the actus reus for theft is the taking of or unlawful control over property without the owner's consent>." BLACK'S LAW DICTIONARY 45-46 (11th ed. 2019).

Mr. Besaw could be viewed as the principal, given the undisputed evidence that he is the one who took the $50,000 from Ms. Meador and given the circumstantial evidence of his criminal intent. The fact that Mr. Besaw delivered $45,000 to Mr. Miller, the mastermind who made the theft possible, does not prevent Mr. Besaw from being the principal.[4] If the jury were to view Mr. Besaw as the principal, substantial evidence would support a finding by the jury that Mr. Miller knowingly solicited, commanded, encouraged, or requested commission of the crime, or aided or agreed to aid in its commission.

The trial court properly gave the accomplice instruction requested by the State.

II. SUFFICIENT EVIDENCE SUPPORTS THE "ASSUMPTION OF A FALSE IDENTITY" ELEMENT OF CRIMINAL IMPERSONATION

Mr. Miller next argues that the State failed to present sufficient evidence to support the "assumed a false identity" element of criminal impersonation.

"'The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact

---

[4] Dean Sanford Kadish has described this type of case, involving a "partly culpable principal" as one that presented problems for common law complicity doctrine—one in which "a secondary actor's liability surely should exceed that of the primary actor." Sanford H. Kadish, *Complicity, Cause and Blame: A Study in the Interpretation of Doctrine*, 73 CAL. L. REV. 323, 340 (1985). "The classic instance" he cites is "Iago coolly whipping Othello into murderous rage," leading him to kill Desdemona. *Id.* "Othello would be guilty of a culpable homicide, but perhaps only of manslaughter in view of the circumstances." *Id.* at 385. "[T]here is no reason why Iago should not be held accountable as Othello's accessory." *Id.* at 365.

could have found guilt beyond a reasonable doubt.'" *State v. Witherspoon*, 180 Wn.2d 875, 883, 329 P.3d 888 (2014) (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)).  A defendant's claim of insufficient evidence admits the truth of the State's evidence and "'all inferences that reasonably can be drawn [from it].'" *State v. Condon*, 182 Wn.2d 307, 314, 343 P.3d 357 (2015) (alteration in original) (quoting *Salinas*, 119 Wn.2d at 201).  Circumstantial evidence is considered just as reliable as direct evidence. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).  We defer to the trier of fact "on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004), *aff'd*, 166 Wn.2d 380, 208 P.3d 1107 (2009).

Mr. Miller was charged with criminal impersonation in the first degree under RCW 9A.60.040(1)(a).  A person is guilty of the crime under that provision if the person "[a]ssumes a false identity and does an act in his or her assumed character with intent to defraud another or for any other unlawful purpose."  Mr. Miller argues that in contacting the Standard, he provided his true name, and making a false representation that he was Ms. Meador's nephew does not constitute assuming a false identity within the meaning of the statute.  This presents an issue of statutory construction.  Our fundamental objective in construing a statute is to ascertain and carry out the legislature's intent, and if a statute's meaning is plain on its face, we give effect to that plain meaning as an

expression of legislative intent. *Dep't of Ecology v. Campbell & Gwinn*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002).

The fact that Mr. Miller provided his true name does not take him outside the operation of the statute. This court has previously held that "the assumption of a false identity" is not the same as using a false name. *State v. Donald*, 68 Wn. App. 543, 550, 844 P.2d 447 (1993). It has further held that "assuming a false identity" does not require assuming the identity of an actual person, as is required for identity theft. *State v. Presba*, 131 Wn. App. 47, 55, 126 P.3d 1280 (2005).

The statutory terms "false identity" and "assumed character" are not defined, but dictionary definitions support their application to someone who misrepresents his relationship to another. In the absence of statutory definitions, courts may rely on the plain meaning of terms. *State v. Kintz*, 169 Wn.2d 537, 547, 238 P.3d 470 (2010). RCW 9A.60.040(1)(a) speaks of a person who "act[s] in his or her assumed character," and one definition of "character" is

> **6 :** POSITION, RANK, CAPACITY, STATUS
>
> <in the *character* of a slave>
>
> <his *character* as a town official>
>
> <I have great pleasure in congratulating you on your first appearance in the *character* of a father, sir . . .—Charles Dickens, *Sketches by "Boz"*, 1836>.

MERRIAM-WEBSTER UNABRIDGED, https://perma.cc/3G5R-6UYP. For purposes of construing the statute's reference to "[a]ssum[ing] a false identity," among the definitions

of identity are "**[2]b :** the role an individual holds in a social group of society" and "**3 :** the condition of being the same with something described, claimed or asserted or of possessing a character claimed." MERRIAM-WEBSTER UNABRIDGED, https://perma.cc /B4XV-4MGF.

Not only does the plain language of the statute encompass falsely asserting a family relationship, but it is easy to foresee that falsely claiming to be someone's spouse, parent, child, or other family member could be used to facilitate a fraud or advance some other unlawful purpose. It is consistent with the legislature's purpose to apply the statute to Mr. Miller's misrepresentation of his relationship to Ms. Meador.

We remand with directions to the trial court to correct section 4.1, page 5 of Mr. Miller's judgment and sentence to reflect the 365 day sentence intended by the trial court. The convictions are affirmed.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder having no precedential value shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

III.    MR. MILLER'S REMAINING EVIDENCE SUFFICIENCY CHALLENGES ALSO FAIL

Before analyzing Mr. Miller's remaining evidence sufficiency challenges, we describe the trial evidence in more detail.

Witnesses Besaw and Miller testified at trial to their dramatically different stories of who orchestrated Ms. Meador's withdrawal of $50,000 and kept all or most of the cash. Bank records were presented that were consistent with Mr. Besaw's claim to have received only $5,000. But banking records for Mr. Miller did not provide evidence that he possessed $45,000 in late summer or early fall of 2016. The State presented evidence that Mr. Miller had a $282,607 judgment entered against him in 2012, had been keeping cash in his house for years, and was on notice that his judgment creditor had threatened collection action in late 2015 and garnished his bank account in the spring of 2016. Bank account statements were admitted showing the Mr. Miller kept little money in his bank accounts, and never for long.

Telephone records revealed a history of text messages and phone calls between Mr. Miller and Mr. Besaw in August 2016 that were consistent with Mr. Besaw's version of events. The State also presented cell tower evidence that placed Mr. Miller near the place, and at the time, when Mr. Besaw claimed to have delivered the $45,000 cash. The defense responded with an expert who testified that Mr. Miller's call could have been made from a location almost 22 miles away from the location suggested by the State's expert.

Mr. Miller's recorded call to the Standard was played for jurors. In it, Mr. Miller represented himself as being Ms. Meador's nephew. He also represented that the family was exploring the surrender of his aunt's annuities because she needed resources to pay

mounting medical expenses. The State presented evidence that Ms. Meador's expenses were largely covered by insurance and that she had ample assets to cover uninsured expenses. The recording of the call also revealed that Mr. Miller was on notice that a hasty cash out of the annuities would incur a penalty that could be avoided by going more slowly and requesting a penalty waiver.

The defense countered with evidence that on two occasions a week before Ms. Meador withdrew the $50,000, the visitor log at Prestige included a handwritten visitor entry for "Ed Besaw" and another for "Edwin Besaw." It also elicited testimony from Ms. Williams that when interviewed, she told defense counsel that she believed she had seen Mr. Besaw visit Ms. Meador once or twice. She testified that the man she recalled seeing was dressed professionally and had closed the door on entering Ms. Meador's room.

Mr. Besaw denied that the visitor log entries in his name were made by him or that he ever visited Ms. Meador. The State presented evidence that the man Ms. Williams saw enter Ms. Meador's room and close the door might have been Mr. David, who was wearing a suit when he visited Ms. Meador and closed the door upon entering her room. In closing argument, the State encouraged jurors to compare Mr. Besaw's supposed signature on the visitor log to signatures on his checks, which it characterized as "not at all similar." RP at 1344. It especially encouraged jurors to look at the entries for the two "Besaw" visits and focus on the visitor's handwritten name of the resident being visited.

17

It suggested that the name "Lillian Meador" as handwritten by "Ed" or "Edwin Besaw" was identical to how Mr. Miller wrote her name, arguing "This is Mark Miller signing in as Eddie Besaw. He's planning, even back as far as [August] 16th." RP at 1344.

A.    *Criminal impersonation – intent to defraud or unlawful purpose element*

Mr. Miller next argues there is no evidence that his assumption of a false identity was done "with intent to defraud another or for any other unlawful purpose."

Criminal impersonation in the first degree, a class C felony, does not require that the act of assuming the false identity enabled the actor to *accomplish* fraud or *achieve* an unlawful purpose; all that is required is the intent. By statute, "[w]henever an intent to defraud shall be made an element of an offense, it shall be sufficient if an intent appears to defraud any person, association or body politic or corporate whatsoever." RCW 10.58.040. Intent to defraud may be inferred from surrounding "conduct that plainly indicates such intent as a matter of logical probability." *State v. Brooks*, 107 Wn. App. 925, 929, 29 P.3d 45 (2001) (internal quotation marks omitted) (quoting *State v. Bergeron*, 105 Wn.2d 1, 20, 711 P.2d 1000 (1985)).

Mr. Miller testified at trial that he "told a fib" about being Ms. Meador's nephew in his call to the Standard "[j]ust to facilitate the call." RP at 1188. He claimed he knew he could get blank forms from the Standard without being a family member, but he testified that when you're a financial advisor, "they put up all kinds of roadblocks for you getting anything from them." *Id.*

18

By Mr. Miller's own admission, then, he believed that by lying he was avoiding "all kinds of roadblocks" the Standard would have put up had he been honest. But the recorded call could also support the inference that he believed deception was necessary to get what he needed. It reveals more than a passing misidentification of himself as a nephew; it reveals repeated lies:

> NORMA: Hi. This is Norma with the Standard. How can I help you?
> MR. MILLER: Yeah. Hi, Norma. My name is Mark Miller. I got the—well, my aunt, Lillian Meador, is in the hospital—or in assisted living. She has two annuities. And we're just trying to get assets to make sure we can pay for everything.
> NORMA: Okay.
> MR. MILLER: She has two annuities. I'm going to go over to her place and get that. But we are—we're probably going to need to surrender these—
> NORMA: Okay.
> MR. MILLER: —and doing that. So I'm just wondering where do we get the paperwork to surrender these?
> NORMA: You talk to us, and we send—mail it—mail it, fax it, or e-mail it to you.
> . . . .
> MR. MILLER: (inaudible). And, yeah, just—we're just trying to get things prepared because I know we've got—you know, there's only so much Medicare's going to do.
> NORMA: Yeah.
> MR. MILLER: And—and then we get to pay for the rest. . . .
> . . . .
> MR. MILLER: Yeah. It's just that we don't know how long this is going to go on, but we know the costs are going to go much higher—
> NORMA: Yeah.
> MR. MILLER: —then what we were planning for when she did these.
> NORMA: Yeah, you know, I understand that. . . .
> . . . .

>MR. MILLER: Okay. Do these need—
>
>NORMA: —(inaudible).
>
>MR. MILLER: —to be notarized, gold sealed, any of those kind of things?
>
>NORMA: As long as your aunt—it's your aunt, correct?
>
>MR. MILLER: Yeah.
>
>NORMA: As long as your aunt can sign it, we should be good.
>
>MR. MILLER: She can sign it. She just—she can't walk right now—
>
>NORMA: Yeah.
>
>MR. MILLER: —so and doing that, so we're going to need some specialized care, nursing, hire private nurses, those kind of things. I know Medicare—we're just at the beginning of this, so we just want to make sure we have the paperwork we need.
>
>And then at that point you'll sit there, and I'm assuming under 30 days. I mean, we've got money for probably the next few months but—
>
>NORMA: All right.
>
>. . . .
>
>MR. MILLER: All right. I'm really concerned about loading up my credit card, which she has—she has more than enough to take care of this.
>
>. . . .
>
>MR. MILLER: Well, I appreciate your help. Hopefully we don't have to surrender these in any way—
>
>NORMA: Uh-huh.
>
>MR. MILLER: —and just keep them, but it's good to know that we have alternatives. Did you find out if that first one does have surrenders?
>
>NORMA: Yeah, hold on. It probably is the exact same, but I'm going to double check that for you. That one's a (inaudible) 12. It's a seven year. Oh, hold on. Let me get into my—
>
>MR. MILLER: Yeah, I had a conversation with her. I said something's got to give. Either we got to do the annuities, or we [have to] sell some of the property. Well, we're not selling the property.

RP at 660-67.

Mr. Miller argued at the close of the State's case that there was no evidence of an unlawful purpose and the trial court should dismiss the criminal impersonation count.

20

The trial court responded that it "disagree[d] 100 percent." RP at 1049. It observed that jurors could find that Mr. Miller was securing the forms "for the purpose of trying to cash in the annuity unlawfully and for an unlawful purpose." RP at 1049. We agree; the evidence was sufficient.

### B.     Attempted Theft

Mr. Miller challenges the sufficiency of the evidence to support his attempted first degree theft conviction on the ground that there was no evidence of intent to commit theft and, alternatively, that the evidence of his acts did not amount to the "substantial step" required to prove attempt.

His argument that there was no evidence of intent is frivolous. There was evidence that following on the heels of his theft from Ms. Meador of $50,000, Mr. Miller took steps to hastily cash out her annuities, subjecting her to early withdrawal penalties to obtain cash she did not need, lying as needed to facilitate the process, and stopping at Brookdale periodically to pick up her mail.

Alternatively, he argues that requesting blank annuity forms was not a substantial step. A person is guilty of an attempt to commit a crime only if, with intent to commit a specific crime, "he or she does any act which is a substantial step toward the commission of that crime." RCW 9A.28.020. "A substantial step is an act that is 'strongly corroborative' of the actor's criminal purpose." *State v. Johnson*, 173 Wn.2d 895, 899, 270 P.3d 591 (2012) (quoting *State v. Luther*, 157 Wn.2d 63, 78, 134 P.3d 205 (2006)).

21

Mere preparation to commit a crime is not an attempt. *State v. Workman*, 90 Wn.2d 443, 449, 584 P.2d 382 (1978). "The question of what constitutes a 'substantial step' under the particular facts of the case is clearly for the trier of fact." *Id.*

Mr. Miller's self-serving testimony at trial was that he merely obtained the surrender forms at Ms. Meador's request, gave them to her, saw her place them in a bureau drawer, and "that's the last I heard about it." RP at 1189.

While Mr. Miller denied completing the forms, the jury could reasonably infer that apart from Ms. Meador's signature, the handwritten completion of the forms was by him. He had the required account information and the completed forms were returned to the Standard within a week of Mr. Miller requesting that they be e-mailed to him. As the prosecutor pointed out in closing argument, the handwriting was "[r]emarkably similar to the way that [Mr. Miller] writes her name in the visitor logs." RP at 1346. And Ms. Meador testified that Mr. Miller tried to cash out her annuities, telling her he wanted the money to buy a cashier's check and gold coins.

Viewed in the light most favorable to the State, evidence amounting to a substantial step included telling Ms. Meador she should surrender the annuities, obtaining the necessary forms (lying as needed to facilitate the process), completing the forms, obtaining her signature, and returning them to the Standard. All that remained was to receive and misappropriate the check—and Mr. Miller periodically stopped at Brookdale to pick up Ms. Meador's mail. These acts are sufficient evidence of a substantial step.

22

IV.     CONVICTING MR. MILLER OF ATTEMPTED FIRST DEGREE THEFT AND CRIMINAL
        IMPERSONATION DOES NOT CONSTITUTE DOUBLE JEOPARDY

Finally, Mr. Miller argues that his convictions for both criminal impersonation and attempted theft constituted double jeopardy because the criminal impersonation was the substantial step for the attempted theft.

The federal and state constitutions contain double jeopardy clauses protecting against multiple punishments for the same offense.  U.S. CONST. amend. V; WASH. CONST. art. I, § 9.  One aspect of protection against double jeopardy is that a person cannot "receive multiple punishments for the same offense."  *State v. Villanueva-Gonzalez*, 180 Wn.2d 975, 980, 329 P.3d 78 (2014).  A claim of double jeopardy can be raised for the first time on appeal and is reviewed de novo.  *State v. Hughes*, 166 Wn.2d 675, 681, 212 P.3d 558 (2009); *State v. Adel*, 136 Wn.2d 629, 631-32, 965 P.2d 1072 (1998).

Where, as here, a defendant's act supports charges under two criminal statutes, a court weighing a double jeopardy challenge "must determine whether, in light of legislative intent, the charged crimes constitute the same offense."  *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 815, 100 P.3d 291 (2004).  If legislative intent is unclear, courts may use the "*Blockburger*"[5] analysis, which asks "whether the convictions were 'the same in law and in fact.'"  *Villanueva-Gonzalez*, 180 Wn.2d at 980 (quoting *Adel*,

---

[5] *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

136 Wn.2d at 632). "If each offense contains an element not contained in the other, the offenses are not the same; if each offense requires proof of a fact that the other does not, the court presumes the offenses are not the same." *In re Pers. Restraint of Borrero*, 161 Wn.2d 532, 537, 167 P.3d 1106 (2007).

Because proof of the "substantial step" element of an attempt crime has factual content only by considering the facts of a particular case, the *Blockburger* analysis requires further refinement when one of two convictions is for an attempt crime. *Id.* "[T]he 'abstract' term 'substantial step' must be given a factual definition to assess whether the attempted crime requires proof of a fact that is not required in proving the other crime." *Id.* (quoting *Orange*, 152 Wn.2d at 818).

Mr. Miller argues that the two convictions constitute double jeopardy because the evidence that he misrepresented himself to the Standard was the State's proof of the "substantial step" element of the attempted theft charge. (We note that this contradicts Mr. Miller's argument that merely obtaining the forms through a ruse could be preparation at most, not the required substantial step.)

Convicting Mr. Miller of both crimes did not constitute double jeopardy because to prove attempted theft, the State was not required to prove that Mr. Miller falsely identified himself to the Standard as Ms. Meador's nephew. *Cf. State v. Esparza*, 135 Wn. App. 54, 64, 143 P.3d 612 (2006) (to prove attempted first degree robbery, the State was not required to prove second degree assault). Since the charging document

24

filed in this case did not allege a particular substantial step, identifying the substantial step requires considering evidence of all the defendant's acts that could qualify. *See id.* at 63. As discussed in section II.B, the State presented evidence of a number of acts that amounted to a substantial step.

We remand with directions to the trial court to correct section 4.1, page 5 of Mr. Miller's judgment and sentence to reflect the 365 day sentence intended by the trial court. The convictions are affirmed.

Siddoway, J.

WE CONCUR:

Lawrence-Berrey, J.

Fearing, J.