IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 80065-5-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HELEN M. DAHLL, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |
| | ) | |

VERELLEN, J. — Helen Dahll assigns error to her convictions for first degree theft and attempted first degree theft. She contends the court erred by excluding evidence, the State prejudiced her right to a fair trial by mismanaging discovery, and the State failed to disprove her good faith claim of title defense to the money she was charged with stealing from her elderly father, John Dahll.[1]

Helen fails to show the court abused its discretion by concluding her father's will was irrelevant to her right to his money before his death and by concluding the probative value of the foreclosure of her home after the charging period did not outweigh its emotional impact.

---

[1] Because they have the same last name, we refer to John and Helen Dahll by their first names.

She also fails to prove actual prejudice from discovery mismanagement by the State because evidence timely disclosed revealed the same information and would have let her attorney pose the same theory she now argues was unavailable to her.

And she fails to demonstrate the State presented insufficient evidence to disprove her defense of an open and avowed taking of her father's money under a good faith claim of title.

Therefore, we affirm.

## FACTS

In April of 2012, Helen became a caregiver for her elderly father John and, after a power of attorney he had signed years earlier took effect, became his attorney-in-fact. John was in the early stages of dementia and suffered from heart disease, congestive heart failure, and arthritis in his knees, among other health problems. Helen hired a home healthcare provider, and John began receiving 24-hour care in his house.

In the spring of 2014, John moved in with Helen, and she rented out his house. She reduced his caretaking hours to only four per day. By this time, he was unable to toilet himself, prepare meals, manage his medications, or get around independently. Helen's neighbors began noticing she often went out for hours and left John alone. Helen would leave the front door unlocked when she went out, so her neighbors would check on John. More than once, a neighbor found John lying on the floor and calling out for Helen, unaware she had left him

alone. As more neighbors became concerned for John's welfare, they submitted reports to Adult Protective Services (APS).

On October 8, 2015, an APS investigator visited John. She noticed his limited cognitive abilities, such as not knowing the date or time, not knowing who was visiting him, not knowing how long Helen left him alone, and being unaware he was unable to care for himself. She returned again on November 4 after a home healthcare worker arrived to find John cold, shivering, and precariously positioned in his bed.

On November 14, the APS investigator returned to check on John, and Helen refused to let her in, relenting only after the police arrived. The investigator found John lying in his own waste and wearing clothes stained with urine and blood. He had a bright red sore on his tailbone and a bloody wound on his buttocks. Helen said she knew he needed 24-hour care but could not afford it because John had only $15,000 in certificates of deposit and no savings. She said his only income was from his Boeing pension and from renting out his house. Helen had not worked in over 10 years due to her own medical issues, and John had financially supported her.

John was moved into an adult family home in November of 2015. On February 3, 2016, an independent guardian was appointed, over Helen's objection, for John's person and estate. The appointment ended Helen's role as John's attorney-in-fact. The guardian reviewed John's finances and discovered at least $200,000 missing from his checking and savings accounts,

3

all of which were at BECU. The guardian called the police. John died on September 15, 2016, and the guardian became personal representative of his estate.

Helen was charged with committing first degree theft between April 1, 2014 and February 22, 2016, attempted first degree theft between March 22 and 23, 2016, and third degree criminal mistreatment between June 1, 2015 and November 16, 2015. The State's theory was that Helen took John's money through many unauthorized automated teller machine (ATM) withdrawals. Helen's pretrial theory was that she spent the missing money both on John's care and to support herself, which he had intended for her to do by making her a joint accountholder. The court excluded evidence that John had made Helen the primary beneficiary of his estate and that Helen's home was in foreclosure at the time of trial.

In the middle of trial, the records officer for BECU provided documents to the State that had not been disclosed previously. Account documents showed several accounts identified as Helen's alone were actually joint accounts held by Helen and John. Helen moved to dismiss under CrR 8.3(b), arguing the late disclosures were prejudicial discovery violations caused by governmental misconduct. The court denied her motion. The jury found Helen guilty of all charges.

Helen appeals, assigning error to only the theft and attempted theft convictions.

4

## ANALYSIS

### I.  Evidentiary Rulings

Helen contends her right to present a defense was violated by the court excluding two pieces of evidence.  We review a court's evidentiary decisions for abuse of discretion and review de novo whether the defendant's right to present a defense was violated.[2]

She argues the court erred when it excluded relevant evidence from John's 1992 will designating her as the primary beneficiary of his estate.

"'To be relevant . . . evidence must (1) tend to prove or disprove the existence of a fact, and (2) that fact must be of consequence to the outcome of the case.'"[3]  The threshold for relevancy is very low, and even minimally relevant evidence is admissible.[4]  Irrelevant evidence is inadmissible.[5]  A defendant has no right to introduce inadmissible evidence.[6]

In 1992, John signed a will designating Helen the personal representative and primary beneficiary of his estate if his wife Mary

---

[2] State v. Bedada, 13 Wn. App. 2d 185, 194, 463 P.3d 125 (2020) (citing State v. Arndt, 194 Wn.2d 784, 797-98, 453 P.3d 696 (2019); State v. Clark, 187 Wn.2d 641, 648-56, 389 P.3d 462 (2017)).

[3] State v. Weaville, 162 Wn. App. 801, 818, 256 P.3d 426 (2011) (alteration in original) (quoting Davidson v. Municipality of Metro. Seattle, 43 Wn. App. 569, 573, 719 P.2d 569 (1986)).

[4] State v. Briejer, 172 Wn. App. 209, 225, 289 P.3d 698 (2012) (quoting State v. Darden, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002)).

[5] ER 402.

[6] Bedada, 13 Wn. App. 2d at 193 (citing State v. Blair, 3 Wn. App. 2d 343, 349, 415 P.3d 1232 (2018)).

predeceased him. The court allowed evidence John designated Helen as his personal representative but excluded his decision to make Helen his primary beneficiary. She argues the court erred because her status as primary beneficiary was probative of her defense that John let Helen use his money on herself during his lifetime.

An heir cannot have an interest in another's estate until that person's death.[7] "Prior to that event there is no 'heir' because no one can be the heir of a living person."[8] This is true for both realty and personalty in an estate.[9] Helen provides no authority that a will evidences a living person's intent to make inter vivos gifts.[10]

Helen was accused of taking John's money without his authorization. John's will had no effect on Helen's legal interest in his money before his death. Because John's decision to make Helen his primary beneficiary was not probative of her legal right to his money nor of John's intent to make gifts to her

---

[7] See Matter of Estate of Baird, 131 Wn.2d 514, 520, 933 P.2d 1031 (1997) ("An intestate interest is created only upon the death of the creator of the interest, i.e., the death of the intestate.") (citing In re Wiltermood's Estate, 78 Wn.2d 238, 240, 472 P.2d 536 (1970).

[8] Wiltermood, 78 Wn.2d at 240.

[9] In re Verchot's Estate, 4 Wn.2d 574, 582, 104 P.2d 490 (1940).

[10] John's will is not part of the appellate record, and Helen does not argue it contained language attempting to make or acknowledging any inter vivos gift.

while alive, the evidence was not relevant. Helen fails to show the court erred or infringed upon her right to present a defense.[11]

Helen also argues the court erred when it excluded evidence her home entered foreclosure after the charging period. Helen sought to introduce evidence of the foreclosure to argue it made it less likely she stole thousands of dollars from her father only to stop paying her mortgage. The court concluded the evidence was minimally probative, and ER 403 barred the evidence as unduly prejudicial in Helen's favor.

Relevant evidence can be excluded when "its probative value is substantially outweighed by the danger of unfair prejudice."[12] "'Evidence likely to provoke an emotional response rather than a rational decision is unfairly prejudicial.'"[13] A court considers the whole case when weighing the risk of unfair prejudice, including:

> "the importance of the fact of consequence for which the evidence is offered in the context of the litigation, the strength and length of the chain of inferences necessary to establish the fact of consequence, the availability of alternative means of proof, whether the fact of consequence for which the evidence is offered

---

[11] See Bedada, 13 Wn. App. 2d at 193 (no right to present inadmissible evidence).

[12] ER 403.

[13] State v. Nguyen, 10 Wn. App. 2d 797, 820, 450 P.3d 630 (2020) (quoting State v. Johnson, 90 Wn. App. 54, 61, 950 P.2d 981 (1998)), review denied sub nom. State v. Thanh Pham Nguyen, 195 Wn.2d 1012, 460 P.3d 178 (2020).

is being disputed, and, where appropriate, the potential effectiveness of a limiting instruction."[14]

When the evidence is of high probative value, "it appears no state interest can be compelling enough to preclude its introduction" without violating the state and federal constitutions.[15]

Helen analogizes to State v. Jones, where our Supreme Court held retrial was required after a defendant being tried for rape was prohibited from testifying the sex was consensual or from cross-examining the victim about having consented.[16]  Only a police officer and the victim testified, and the State did not call other witnesses to the alleged rape.[17]  Under those circumstances, evidence of consensual sex was the defendant's "entire defense" and had "extremely high probative value."[18]  Excluding it violated the defendant's right to present a defense, requiring retrial.[19]

Helen sought to introduce evidence of the foreclosure to illustrate she could not afford her mortgage and therefore could not have stolen hundreds of thousands of dollars years earlier.  Unlike Jones, evidence of the foreclosure is minimally probative of the crimes charged.  It occurred outside the charging

---

[14] Bedada, 13 Wn. App. 2d at 193-94 (quoting State v. Kendrick, 47 Wn. App. 620, 628, 736 P.2d 1079 (1987)).

[15] State v. Jones, 168 Wn.2d 713, 720, 230 P.3d 576 (2010) (quoting State v. Hudlow, 99 Wn.2d 1, 16, 659 P.2d 514 (1983)).

[16] 168 Wn.2d 73, 717-18, 721, 230 P.3d 576 (2010).

[17] Id. at 718.

[18] Id. at 721.

[19] Id. at 721, 725.

period and after Helen lost access to John's accounts. Only by layering inferences does it suggest Helen's innocence. Again, unlike Jones, other evidence allowed the same argument. Helen introduced evidence she had not paid her homeowner's association dues since John died and elicited other testimony she should "write a book on how to survive with no cash for two or three years."[20] She also introduced evidence that John had supported her financially "for some time."[21] The evidence of foreclosure had little probative value because it could not directly establish Helen's innocence, and she introduced other evidence allowing the same arguments. Helen fails to show the court abused its discretion by concluding the foreclosure's minimal probative value was outweighed by its emotional impact.

## II. CrR 8.3(b) Motion to Dismiss

Helen contends the State prejudiced her by mismanaging discovery when it failed to timely obtain and provide documents showing she and John held many joint bank accounts, which prevented her attorney from adequately preparing and from pursuing the theory that someone stole John's identity to make the ATM withdrawals.

---

[20] Report of Proceedings (RP) (Jan. 29, 2019) at 1284.

[21] RP (Jan. 10, 2019) at 469.

We review a court's decision on a CrR 8.3(b) motion to dismiss for abuse of discretion.[22]  A court abuses its discretion where its decision rests on untenable grounds or was made for untenable reasons.[23]

A court can dismiss a charge against a defendant under CrR 8.3(b) when the defendant shows arbitrary action or misconduct by the government prejudiced her right to a fair trial.  The movant has the burden of proving both misconduct and resulting prejudice.[24]  "[G]overnmental misconduct need not be of an evil or dishonest nature; simple mismanagement is sufficient."[25]  Where misconduct is proven, dismissal is an "extraordinary remedy" to be granted "only as a last resort"[26] upon a showing "of not merely speculative prejudice but actual prejudice to the defendant's right to a fair trial."[27]

Assuming the State mismanaged discovery by failing to thoroughly investigate and timely disclose the ownership of Helen's various accounts at BECU, she fails to prove actual prejudice.  In August 2017, the State timely disclosed evidence during discovery, including three documents showing Helen and John's history of joint accounts: BECU member account signature cards

---

[22] State v. Brooks, 149 Wn. App. 373, 384, 203 P.3d 397 (2009) (citing State v. Blackwell, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993)).

[23] Id. (citing Blackwell, 120 Wn.2d at 830).

[24] State v. Salgado-Mendoza, 189 Wn.2d 420, 427, 403 P.3d 45 (2017).

[25] Blackwell, 120 Wn.2d at 831 (citing State v. Dailey, 93 Wn.2d 454, 457, 610 P.2d 357 (1980)).

[26] Brooks, 149 Wn. App. at 384 (citing Wilson, 149 Wn.2d at 12).

[27] State v. Rohrich, 149 Wn.2d 647, 649, 71 P.3d 638 (2003).

from 1985 and 1987 creating joint accounts for John, Mary, and Helen, and a 2000 BECU Master Enrollment and Member Agreement identifying John, Mary, and Helen as joint account owners. Pretrial, defense counsel argued Helen had a legal right to John's money because "[Helen] was listed as a joint accountholder, and she has been for decades on both of her parents' accounts. Not all of them, but on many of their accounts, [Helen] was listed as a joint accountholder."[28] Thus, pretrial, defense counsel knew Helen and John held joint accounts and used that information to articulate an exculpatory theory.

These circumstances are similar to State v. Woods[29] and State v. Salgado-Mendoza.[30] In Woods, the state crime laboratory failed to diligently analyze a defendant's DNA,[31] causing a multi-month delay.[32] The court concluded the defendant failed to demonstrate prejudicial misconduct because the delay did not "cause the interjection of new information into the case,"[33] especially when the defendant had always known the State intended to use his DNA to prove his guilt.[34] In Salgado-Mendoza, a defendant driver charged with driving under the influence did not suffer actual prejudice when the State

---

[28] RP (Jan. 7, 2019) at 73.

[29] 143 Wn.2d 561, 23 P.3d 1046 (2001).

[30] 189 Wn.2d 420, 403 P.3d 45 (2017).

[31] Deoxyribonucleic acid.

[32] Woods, 143 Wn.2d at 583.

[33] Id. at 584.

[34] Id. at 584-85.

mismanaged its case by failing to disclose the identity of its expert toxicologist before the morning of trial.[35] Five months before trial, the State had provided the names of nine potential toxicologists from the state crime laboratory, all of whom were available for interviews and whose resumes and professional backgrounds were also available online.[36] Regardless of which toxicologist testified, defense counsel could have expected each to testify about the same set of topics about blood alcohol testing.[37] The driver articulated a risk of prejudice but failed to prove actual prejudice.[38]

On this record, Helen had sufficient evidence of joint account ownership to articulate a defense theory and prepare for trial on it, and she fails to show the belated discovery and disclosure prevented her from preparing an alternate exculpatory theory also based upon joint account ownership. As in Woods and Salgado-Mendoza, the State's mismanagement of discovery did not prevent defense counsel from preparing for trial or force counsel to proceed unprepared. Because Helen fails to prove actual prejudice, the court did not abuse its discretion by denying her CrR 8.3(b) motion to dismiss.

III. Substantial Evidence Challenge

Helen contends the State failed to produce substantial evidence disproving her statutory "good faith claim of title" defense to theft. Substantial

---

[35] Salgado-Mendoza, 189 Wn.2d at 435.

[36] Id. at 438.

[37] Id. at 438-39.

[38] Id. at 435-36.

evidence supports a jury's finding when, "'after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"[39] A challenge to the sufficiency of the evidence admits the truth of the evidence and all reasonable inferences from it.[40]

A person is guilty of first degree theft when, with the intent to deprive, she wrongfully obtains or exerts unauthorized control over at least $5,000 of another's property.[41] It is a complete defense to any charge of theft that the allegedly stolen property was "'appropriated openly and avowedly under a claim of title made in good faith, even though the claim be untenable.'"[42] The defense has two elements: "(1) an open and avowed taking of property and (2) a good faith claim of title to the property."[43] The State did not dispute the evidence supported giving this instruction, and it had to disprove the defense beyond a reasonable doubt.[44]

The core of Helen's argument is that the evidence showed she could have had a reasonable, good faith belief in her right to use John's money for

---

[39] State v. Davis, 182 Wn.2d 222, 227, 340 P.3d 820 (2014) (quoting State v. Hosier, 157 Wn.2d 1, 8, 133 P.3d 936 (2006)).

[40] State v. Miller, 14 Wn. App. 2d 469, 481, 471 P.3d 927 (2020) (quoting State v. Condon, 182 Wn.2d 307, 314, 343 P.3d 357 (2015)).

[41] RCW 9A.56.020(1)(a); RCW 9A.56.030(1)(a).

[42] State v. Mora, 110 Wn. App. 850, 855, 43 P.3d 38 (2002) (quoting RCW 9A.56.020(2)).

[43] State v. Ager, 128 Wn.2d 85, 95, 904 P.2d 715 (1995).

[44] State v. Hicks, 102 Wn.2d 182, 186-87, 683 P.2d 186 (1984).

her own benefit. But we review the evidence in a light most favorable to the State after assuming its truth and defer to the jury about witness credibility, conflicting testimony, and persuasiveness of evidence.[45] Thus, the question is not whether a juror could have found for Helen but whether a reasonable juror could have concluded beyond a reasonable doubt that Helen did not have a good faith claim of title to at least $5,000 of John's money.[46]

Helen relies upon a BECU Master Enrollment and Member Agreement governing her and John's joint accounts to argue she had a good faith belief in her right to John's money.[47] The agreement provides "that any joint account-holders (with respect to deposits) . . . will have as much right to withdraw funds from deposit or loan accounts as the primary member does."[48]

But the right to withdraw funds from an account does not change ownership of the funds.[49] RCW 30A.22.090(2) provides that funds held in a

---

[45] Miller, 14 Wn. App. 2d at 481 (citing Condon, 182 Wn.2d at 314; State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004), aff'd, 166 Wn.2d 380, 208 P.3d 1107 (2009)).

[46] Davis, 182 Wn.2d at 227; RCW 9A.56.020(2)(a); RCW 9A.56.030(1)(a).

[47] Helen also relies upon language from a depository account signature card from 1987 to support her argument. Because the Master Enrollment Agreement is from 2000, was signed by Helen, John, and Mary, and expressly "contains the terms and conditions governing membership in BECU and its deposit products," exhibit 51, at 2, it necessarily superseded any prior agreement governing depository accounts.

[48] Ex. 51, at 2.

[49] See Mora, 110 Wn. App. at 856 ("A joint tenant may have the right to withdraw funds, but this does not mean he or she owns the funds.") (citing In re Estate of Tosh, 83 Wn. App. 158, 166, 920 P.2d 1230 (1996)).

joint account "belong to the depositors in proportion to the net funds owned by each depositor on deposit in the account, unless the contract of deposit provides otherwise." Unchallenged jury instruction 13 echoed these rules. The Master Enrollment agreement speaks only to the right to withdraw; it is silent about ownership. Thus, viewed in a light most favorable to the State, a reasonable juror could have concluded Helen did not have a good faith belief in her ownership over John's monies in their joint accounts.

Other evidence supports this conclusion. Helen told the APS investigator she used $18,400 of John's money to buy a car, and she planned on repaying him. No evidence showed repayment. Beginning on July 15, 2014, and continuing for years, Helen accepted a $1,200 monthly rent payment for John's house, despite identifying it as one of his assets and explaining she rented it out to help manage his money. Helen wrote the lease and required that the rent be paid to her. Especially when combined with the Master Enrollment Agreement, a reasonable juror could conclude Helen did not have a good faith claim of title over at least 5,000 of the dollars she took from John.

A reasonable juror could also conclude that Helen's conduct around taking John's money was not open and avowed. Helen defied a court order and refused to provide an accounting of John's finances to the guardian. Helen lied to the APS investigator about John's income, claiming he received the rent from his house when John's accounts showed no record of rent payments. She lied to the investigator again in October of 2015, saying that John had no savings

and only $15,000 invested in certificates of deposit, when he actually had at least $100,000 in cash and Helen had already withdrawn over $100,000 from his accounts that year alone. Helen also lied about John's financial status in January 2015 when she told a nurse John could only afford four hours of daily home care, despite his net worth of $525,000 and Helen having recently withdrawn $79,608 in cash from his accounts. And Helen lied about her financial status to her neighbors. For example, one neighbor testified Helen described herself as "independently wealthy."[50] From this evidence, a reasonable juror could conclude beyond a reasonable doubt that Helen was not taking John's money openly and avowedly.

To the extent Helen contends the State failed to disprove the "good faith claim of title defense" for the attempted theft charge, substantial evidence supports the jury's conclusion. Helen's power of attorney was revoked on February 3, 2016, when an independent guardian was appointed for John's person and estate. Helen's attorney signed the order appointing the guardian. On March 22, within hours of the guardian reminding Helen her power of attorney had been revoked, Helen took John into the bank and used $8,800 from his individual investment account to open a new joint bank account. She then withdrew several hundred dollars from the account. From this, a reasonable juror could conclude Helen did not have a good faith claim of title

---

[50] RP (Jan. 10, 2019) at 452.

16

when opening the joint account with John's investments and withdrawing money.

Because the State presented sufficient evidence to demonstrate beyond a reasonable doubt that Helen took and attempted to take more than $5,000 of John's money and did not do so under a good faith claim of title or openly and avowedly, substantial evidence supported the jury's verdicts.

Therefore, we affirm.

_____
Verellen, J.

WE CONCUR:

_____    _____
Chun, J.                        Appelwick, J.