IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 85958-7-I |
| Respondent, | |
| v. | DIVISION ONE |
| CONSTANCE LATICIA FORD, | UNPUBLISHED OPINION |
| Appellant. | |

SMITH, C.J. — Constance Ford was staying at her daughter Faith Ford's home when she got in an argument with Faith's fiancé, Joey Phillips. During the argument, Ford picked up two knives and pointed one at Faith and Faith's three-month-old son, J.P. Ford grabbed Faith and J.P. and dragged them outside towards her car, screaming that she wanted her daughters where she could see them or she would "kill this baby." Law enforcement arrived and arrested Ford.

The State charged Ford with assault of a child in the second degree and unlawful imprisonment. At trial, the jury convicted Ford of the lesser included offense of attempted assault of a child in the second degree and unlawful imprisonment. Ford appeals, asserting that the State failed to present sufficient evidence to support the conviction for attempted assault of a child. She also contends that because she was indigent at the time of sentencing, the court erred in imposing a victim penalty assessment (VPA). Because a rational jury

could have found the State proved the required elements beyond a reasonable doubt, we affirm the conviction but we remand for the trial court to strike the VPA.

FACTS

Constance Ford has two daughters, Ajahni "Faith"[1] Ford (Faith) and A.F., who was 13 years old at the time of the incident. In August 2021, Faith lived with her fiancé, Joey Phillips, and their three-month-old son, J.P. Ford openly disapproved of Faith and Phillips' relationship and Ford and Phillips largely avoided each other. But early August 21, 2021, Ford and A.F. arrived uninvited at Phillips's apartment and asked to stay. Reluctantly, Faith and Phillips agreed to allow Ford and A.F. to sleep on their couch.

The following evening, Phillips attended a Seahawks game with his sister, Felicia Ward, and Ward's fiancé Jeffrey Weister. During the game, Ford used Faith's phone to text Phillips, asking to speak with him. When Phillips, Ward, and Weister all returned to the apartment, Phillips did not want to speak with Ford. This resulted in "some argument back and forth," during which Ford tried to corner Phillips. Frustrated with Ford's hostility, Faith and Phillips decided to ask her to leave.

While Faith and Phillips were discussing their options in another room, Ford's demeanor changed dramatically and she seemed to enter a "panic state." Ford began screaming that she was having trouble breathing and asked Ward to call for an ambulance. When Ward stepped outside to call for medical assistance, Weister, A.F., and Ford all followed. Weister began recording the

---

[1] Faith's legal name is Ajahni, but she is known by Faith in her daily life.

incident on his phone video camera. Ford continued to deteriorate once outside, "laying on the sidewalk, screaming that she couldn't breathe, that she was dying, [and] that she needed an ambulance." Ford then suddenly stood up, walked back inside the apartment, and locked the door behind her.

Moments later, Phillips opened the door and asked Ward to call 911. Inside the apartment, Ford was now sitting on Faith, who was holding J.P. Ford had two knives, one of them pointed to the room at large and the other pointed at Faith and J.P. She then began screaming for A.F., who had stayed outside the apartment. Ford began ordering everyone else to stay away and threatening to "kill this baby" if she did not see A.F.

When A.F. stepped into view, Ford allowed Faith to take one of the knives but grabbed her by the wrist and attempted to force her outside. She continued to shout at the others to keep their distance, yelling "I swear to God I'll slit this baby's throat." Ford then wrapped an arm around Faith's neck and began dragging her towards the front door. Faith was still holding J.P., who began crying and screaming.

Once alongside the car, Ford continued to threaten J.P., telling Faith, "I got a knife to your baby's throat bitch . . . you better listen to me before you have a dead baby in your arms." Ford also demanded that A.F., visibly upset by the circumstances, get into the backseat.

When law enforcement arrived, they saw Ford still holding a knife to J.P. She was attempting to wrestle J.P. away from Faith, who was struggling to keep the child in her arms. Ford dropped the knife in response to law enforcement

3

commands and was arrested without further incident. Once in custody, however, Ford remained "highly agitated" and continued "screaming about killing the baby."

The State charged Ford with assault of a child in the second degree and unlawful imprisonment. J.P. was the only charged victim for the former, while both Faith and J.P. were listed as victims for the latter.

Although Ford did not testify at trial, the State presented a recorded jail phone call on which Ford stated, "I ain't crazy. I did this shit on purpose. . . the baby was . . . my only weapon. The rest was a decoy." The jury acquitted Ford of assault of a child in the second degree but convicted her of the lesser included offense of attempted assault of a child in the second degree. The jury convicted Ford of unlawful imprisonment as charged.

On the recommendation of both parties, the court imposed a mental health sentencing alternative under RCW 9.94A.695. The court also ordered Ford to pay a $500 victim penalty assessment. Ford appeals.

ANALYSIS

Sufficiency of Evidence

Ford asserts that the State failed to provide sufficient evidence to support her attempted assault conviction because she did not intend to create a reasonable apprehension of harm in J.P. Because a rational jury could have found that the State proved the required elements of attempted assault, including intent, beyond a reasonable doubt, we disagree.

In determining whether a conviction rests on sufficient evidence, we consider " 'whether, after viewing the evidence in the light most favorable to the

4

prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " In re Pers. Restraint of Martinez, 171 Wn. 2d 354, 364, 256 P.3d 277 (2011) (quoting State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980)). We do not reevaluate witness credibility, conflicting testimony, or the persuasiveness of the evidence. State v. Davis, 182 Wn.2d 222, 227, 340 P.3d 820 (2014).

A person commits the crime of assault " 'merely by putting another in apprehension of harm whether or not [that person] actually intends to inflict or is incapable of inflicting that harm.' " State v. Byrd, 125 Wn.2d 707, 712, 887 P.2d 396 (1995) (internal quotation marks omitted) (quoting State v. Frazier, 81 Wn.2d 628, 631, 503 P.2d 1073 (1972)). The specific intent to cause that reasonable apprehension of harm is an essential element of assault in the second degree. Byrd, 125 Wn.2d at 712-13. Assault of a child in the second degree requires that the actor be over the age of 18 and the victim be under the age of 13. RCW 9A.36.130.

A person commits the crime of attempted assault if, "with intent to commit [an assault], he or she does any act which is a substantial step toward the commission of that crime." RCW 9A.28.020. Intent may be inferred from both the actor's conduct and surrounding circumstances. State v. Elmi, 138 Wn. App. 306, 313-14, 156 P.3d 281 (2007). And an act constitutes a substantial step toward the commission of an offense if it is more than "mere preparation" and " 'strongly corroborative of the actor's criminal purpose.' " State v. Miller, 14 Wn. App. 2d 469, 483, 471 P.3d 927 (2020) (internal quotation marks omitted)

5

(quoting State v. Johnson, 173 Wn.2d 895, 899, 270 P.3d 591 (2021)). Even slight corroborative acts may be sufficient. State v. Grundy, 76 Wn. App. 335, 337, 886 P.2d 208 (1994).

Ford argues that the State cannot establish that she intended to create a reasonable apprehension of harm in J.P. and therefore cannot prove the essential elements of attempted assault beyond a reasonable doubt. Without intent, she contends, there can be no substantial step toward the commission of the crime. But given that intent can be inferred, sufficient evidence exists for a rational trier of fact to determine that Ford intended to assault J.P. Similarly, sufficient evidence shows that Ford took a substantial step in the commission of that assault.

Addressing intent, the State introduced extensive evidence, including Weister's video recording that documented the events of the evening in question. The video displayed that, midway through an already escalating fight, Ford obtained two knives, physically restrained Faith and J.P., and pointed a knife in their direction. She loudly and repeatedly threatened to kill J.P., increasing in specificity. With an arm around Faith's neck, Ford dragged both Faith and J.P. outside the home, continuing to yell and waive the knife. She alternated between holding the knife close to J.P.'s neck and belly while J.P. screamed and cried. She then attempted to wrestle the three-month old out of his mother's arms. Given the extent of this evidence, and viewing it in a light most favorable to the prosecution, a rational jury could have easily concluded that Ford intended to create a reasonable apprehension of harm in J.P.

Ford challenges this conclusion by contending that she never intended to make J.P. think she would hurt him; she only intended to make the surrounding adults believe that she would. However, the jury could have determined that she intended to do both. And her self-serving statements now, regarding her intent at the time, do not preclude this court from determining that the jury had the ability to do so. A rational trier of fact, relying on the evidence presented, could find that Ford intended to create a reasonable apprehension of harm in J.P. when she held a knife to his body. That she now asserts that she only intended to scare his parents is irrelevant. Further, Ford would likely have had less success in her asserted purpose of manipulating Faith and Phillips had J.P. been unconcerned by her behavior.

As to the second element of attempt, a substantial step toward the commission of the intended crime, Ford wielded a knife close to J.P.'s body while yelling threats to his life. This is well beyond mere preparation and clearly corroborates the intended assault. Ford took a substantial step.

Because a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found intent and a substantial step toward the commission of the crime beyond a reasonable doubt, sufficient evidence supports the attempted assault conviction.

## Victim Penalty Assessment

Ford next asserts that the VPA should be stricken because she is indigent. The State agrees. We remand for the court to strike the VPA from the judgment and sentence.

7

In July 2023, the legislature amended RCW 7.68.035 to prohibit the imposition of a VPA if the court finds a defendant indigent at the time of sentencing.  Statutory amendments apply retroactively when a party's appeal is pending when the amendments took effect.  State v. Ellis, 27 Wn. App. 2d 1, 17, 530 P.3d 1048 (2023).

Here, neither party disputes that Ford was indigent at sentencing, and that the VPA should be stricken.

We affirm Ford's conviction but remand for the court to strike the VPA.

_Smith, C.J._

WE CONCUR:

_Feldman, J._      _Chung, J._

8