IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| MARK R. HOFFMAN, | ) | |
| | ) | No. 38833-6-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PROVIDENCE HEALTH & | ) | UNPUBLISHED OPINION |
| SERVICES - WASHINGTON, a | ) | |
| Washington State Nonprofit Corporation, | ) | |
| dba Providence Medical Group, | ) | |
| | ) | |
| Respondent. | ) | |

SIDDOWAY, J. — Mark Hoffman, M.D., appeals the summary judgment dismissal of his lawsuit alleging wrongful termination of his employment by Providence Health & Services - Washington (Providence). His specific assignments of error are to the dismissal of his claims for wrongful termination in violation of public policy, disability discrimination, and failure to accommodate his disability.

Dr. Hoffman failed to present evidence that retaliation, or discrimination based on his allergies, was a substantial factor in Providence management's decision to terminate his employment. We affirm.

FACTS AND PROCEDURAL BACKGROUND

Because this case was resolved by summary judgment, the facts we recount come from the declarations, depositions, and documents the parties submitted in connection with their cross motions for judgment as a matter of law.

In the beginning of 2020, Therese (Teri) Etherton was working as a practice manager for Providence in Spokane, overseeing its three urgent care clinics, when medical providers began closely following developing information on a potential global pandemic from COVID-19 (coronavirus 2019). By the beginning of February, personnel at Providence's urgent care centers were screening and following protocols for patients who had recently traveled to China or had close contact with persons suspected of having contracted the virus. On Wednesday, February 5, Ms. Etherton sent an e-mail to staff advising them that she had updated the travel questions on the workflow Providence had created for patients. She expressed concern about sending patients away without being seen and asked personnel to check with her or the charge nurse before taking that step.

Dr. Mark Hoffman was employed by Providence as a physician at its urgent care centers, assigned to its Spokane Valley (Valley) clinic. He is a board-certified physician who has practiced medicine for over 30 years. He was occasionally assigned to work at Providence's two other urgent care centers, the North clinic and South clinic. On the early afternoon of Sunday, February 9, 2020, Dr. Hoffman, having reviewed Ms.

Etherton's e-mail from a few days earlier, sent a response to her and staff via "Reply

All."

His e-mail began, "I am sorry for being the rust that makes the squeaky wheel.

But I must disagree with this policy." Clerk's Papers (CP) at 298. He recounted his

experience with the 2009 H1N1 virus[1] and the process followed by the medical group

with which he was associated at that time. (Dr. Hoffman had become employed by

Providence in 2014.) His e-mail continued (spelling and punctuation in original):

> We are dealing with a novel virus. That could potentially put all of our staff and patients at risk in the urgent care setting. We do not have the ability here to truly isolate a patient. We do not have showers to use immediately after seeing the patient. We do not have the ability to decontaminate the waiting room or urgent care, in a timely manor. There are potently to many people who could enter the room to contain the virus to the room safely.
>
> From a strictly financial/legal standpoint. Some simple question's for you.
>
> Would you go to an urgent care when it came out in the news that day that they saw a coronavirus patient in the urgent care? All of us would probably say yes. The general public will probably say no. Are you prepared to deal with the legal issues of death, or significant illness to a care provider exposed in a setting not set up to deal with a novel virus?
>
> The workman compensation issues here are significant. The OSHA [Occupational Health and Safety Act of 1970] issues are significant. And the risks to our patient's and staff issues our significant.

---

[1] Commonly known as swine flu. The Centers for Disease Control and Prevention (CDC) describes the H1N1 flu virus as first being detected in April 2009 in the United States, and being declared the start of the first flu pandemic in 40 years in June 2009 by the World Health Organization. According to the CDC, H1N1 was estimated to have killed between 151,700 and 575,400 people worldwide during the first year it circulated. *See Influenza (Flu): Summary of Progress Since 2009*, CDC, https://www.cdc.gov/flu /pandemic-resources/h1n1-summary.htm [https://perma.cc/C9N6-CFXL].

CP at 298.  Dr. Hoffman then identified facilities and training "[w]e need to have."  *Id.*

Short of that, he "recommend[ed] the simple method outlined" as followed by his group

in the H1N1 era.  *Id.* at 299.

According to Dr. Hoffman, soon after he sent the e-mail, his supervisor, Dr.

Michael Ravelo, called him, "aggressively angry."  CP at 76.  Dr. Hoffman alleges that

Dr. Ravelo told him he had no right to send the e-mail and said he "would pay for

sending that email."  CP at 328.  Dr. Hoffman claims he offered to send a retraction

because the e-mail "was absolutely not meant to go to everyone," but Dr. Ravelo said that

under no circumstances was Dr. Hoffman to communicate any further about it.  CP at 76.

Dr. Ravelo said he would handle it.

Dr. Hoffman contends that the next day, Dr. Ravelo approached him in person and

again told him "[he] would pay" and Dr. Ravelo would "'take [him] down' for th[e]

email."  CP at 328.[2]

On Tuesday morning, February 11, Dr. Ravelo sent his own e-mail to Dr.

Hoffman and Ms. Etherton with copies to staff who had received Dr. Hoffman's "Reply

All" e-mail.  It stated,

> Thank you for your input.  In the future please direct input to myself and
> we will coordinate any changes as necessary.  In the attempt to continue to

---

[2] Dr. Ravelo agrees that he phoned Dr. Hoffman after seeing the "Reply All" e-mail to say that Providence management was already working on further responses to COVID-19.  According to Dr. Ravelo, Dr. Hoffman apologized and said he had not meant to send the e-mail to everyone.  Dr. Ravelo denies ever threatening Dr. Hoffman.

> streamline our care and workflow we will gracefully disregard this
> commentary as we have decided as a group to continue the process as it
> was agreed upon by our multi-disciplinary team.
>
> Again there will be NO CHANGES to our workflow.

CP at 297.

Ms. Etherton later testified that on first seeing Dr. Hoffman's e-mail, "I didn't understand why he sent it to the group that he did, so it kind of bugged me a little bit," since "[i]t made us look like we didn't know what we were doing." CP at 392, 394. But Dr. Hoffman recalls that when he approached Ms. Etherton the day after sending the e-mail to apologize for copying everyone, she told him not to worry about it, and that she had made the same mistake many times. She also told him he'd "[made] some very good points." CP at 67.

A little more than three weeks later, several employees at the Valley clinic reported to Ms. Etherton that at the end of the shift on March 3, 2020, they had seen Dr. Hoffman leave with his arms and backpack full of boxes of face masks from the clinic. Obtaining adequate personal protective equipment was difficult at the time, according to Ms. Etherton:

> [I]t was just a horrible time. We could not get supplies. The girls were
> wearing the simple paper mask for—you know, at least all day, sometimes
> two days until they were visibly so ill. That was our pushing through it at
> that point and the 95 masks were a little hard to find, and they would wear
> those for a week until they couldn't stand it any longer. So the thought of
> somebody removing them from the site was very emotional, and I could
> just read it in their eyes that they felt betrayed.

5

No. 38833-6-III
*Hoffman v. Providence Health & Servs. - Wash.*

CP at 129.

Ms. Etherton asked the employees to provide her with written reports of what they had seen, and she received two e-mails on the afternoon of Thursday, March 5. Danielle Paradiso, a medical assistant, wrote:

> On 3/3/20 Dr. Mark Hoffman was seen taking procedures masks from the UC [Urgent Care]. He had his bag full and an arm full of boxes of these masks, seen by me Danielle Paradiso, Ryan Taylor and Susie Linderman.
>
> Thank you,
> Danielle Paradiso

CP at 293. Ryan Taylor, also a medical assistant, wrote:

> Hi Teri- As requested, here is what I witness [sic] several nights ago regarding Dr. Hoffman. Please let me know if you need any further detail.
>
> I witnessed Dr. Hoffman "setting aside" upwards of 6-8 boxes (one arm-full, and in his personal bag) of our yellow procedure masks, stating that they were ordered for him specifically, as he has an "anaphylactic" type reaction when he wears the less expensive versions that central supply stocks. I was under the assumption that the "upgraded" masks were for ALL staff use, not just Dr. Hoffman?
>
> Thank you...
>
> Ryan

CP at 289.

Ordinarily, the first person Ms. Etherton would have contacted about the complaints was Dr. Ravelo, but he was out of town, so she notified Cora Kinney, her Human Resources (H.R.) contact at Providence. Ms. Etherton had a COVID planning meeting set for that afternoon with Providence's chief operating officer for Spokane, Kathy Tarcon, and its chief medical officer, Dr. Mike Marshall, and she reported the

6

allegations to them as well. According to Ms. Etherton, H.R., Ms. Tarcon, and Dr. Marshall assumed responsibility for addressing the issue. Ms. Etherton was notified on Friday, March 6, that Dr. Hoffman would be informed he was being placed on administrative leave. Drs. Robert Litchfield and David Page placed him on administrative leave that day.

The complaints were brought to the attention of Juliet Gerling, the chief H.R. officer for Providence's Eastern Washington, Montana Physician Enterprise, who assigned Lourie Morse to investigate. Ms. Morse is employed by Providence as an H.R. consultant, has over 30 years of H.R. experience, and is tasked with investigating "more complex" employment issues, including issues that might result in litigation. CP at 172.

Between March 11 and March 13, Ms. Morse interviewed Ms. Paradiso and Mr. Taylor, Dr. Hoffman, and four other witnesses. Dr. Hoffman claims that it was only on being contacted by Ms. Morse that he first learned why he had been placed on administrative leave the prior Friday. She prepared a report on March 18 that summarized her interviews and reflected her finding.

She interviewed Mr. Taylor on March 11, and he repeated the substance of his e-mail to Ms. Etherton. He said that he saw Dr. Hoffman leaving with the masks at approximately 7:45 or 8:00 p.m. on March 3. He said he did not confront Dr. Hoffman, but thought the doctor's actions were unusual.

7

Ms. Morse interviewed Ms. Paradiso on March 12; she, too, repeated the substance of her e-mailed report. She affirmed that when she asked Dr. Hoffman about the masks, he told her his wife has an autoimmune disorder and they were for her.

Ms. Morse interviewed Beth Olson, R.N., on March 12. Nurse Olson was responsible for ordering masks. She told Ms. Morse that when ordering masks the last week of February, she had been directed to order as many as she could. She worked on Sunday, March 1, at which time there was an ample supply of masks. When she returned to work on March 4, the supply was significantly diminished. She denied any knowledge that Dr. Hoffman was ordering his own supply of masks or that masks she ordered were not available to every employee who needed them. She said that the masks Dr. Hoffman took from the clinic on March 3 are thicker and softer, and are preferred by all the staff.

Ms. Morse interviewed Sue Linderman, R.N., on March 13. Nurse Linderman reported seeing Dr. Hoffman move masks from his desk drawer to his bag on March 3 but did not report it because she did not believe he intended to steal the masks, which she believed were ordered for him. She was unable to recall how she came to believe that the masks were ordered for Dr. Hoffman.

Ms. Morse interviewed Dr. Hoffman on March 13. He told Ms. Morse that the masks he took were a type ordered just for him, because of his allergies. According to Dr. Hoffman, a couple of years into working for Providence, he began to experience symptoms commonly associated with allergies when he wore the standard mask. He

8

reports that the mask "irritate[d] my nose and my throat, and . . . was progressive over time," and that "within seconds, you know, I could feel my throat scratching and tightening." CP at 104-05. He did not seek a formal diagnosis from another medical professional. Having noticed that yellow masks sometimes available at the North clinic did not present the same problems, Dr. Hoffman asked that the yellow masks be ordered for the Valley location for him to use. He had used only the yellow masks ever since.

Dr. Hoffman told Ms. Morse that when other staff use the yellow masks, there are none left for him. He said that when he spoke to Ms. Etherton about this earlier, she told him to keep the masks in his car or take them home. He said the prior practice manager had approved him doing the same thing. He admitted that he left on the evening of March 3 with six boxes of the masks: three in his bag, and three under his arm. He denied saying they were for his wife and said he left them in his car.

Ms. Morse interviewed Ms. Etherton on March 13. Ms. Etherton said she had not had any conversation with Dr. Hoffman that would lead him to believe she approved him taking masks out of the clinic or to his car. She said she did not know he had ever done that. She was unaware that he had any such understanding with Jo-Ellen Thorne, the practice manager who preceded her. She said there are 50 masks per box in the boxes taken by Dr. Hoffman. Ms. Etherton had compared the three types of masks that are used at Providence and found that all are latex free and have no identifiable differences.

Ms. Morse interviewed Ms. Thorne on March 13. Ms. Thorne said that as the prior practice manager, she had worked with Dr. Hoffman for several years. (Ms. Thorne had retired in October 2019.) She said that all staff were allowed to wear the preferred mask because they are more comfortable. She said there was no understanding that they were only for Dr. Hoffman or that he could take a supply of masks home with him. She said that Dr. Hoffman had told her in the past that his wife was ill and he had to wear the masks to ensure he did not take illnesses home with him.

Ms. Morse found, based on her interviews, that Dr. Hoffman had removed six boxes of face masks without permission.

After concluding her interviews, Ms. Morse reported first to Ms. Gerling. While Ms. Morse would often make a recommendation whether an employee should be terminated, she recommended in this case that H.R. leave the decision to senior management, since a physician was at issue.

Ms. Gerling and Ms. Kinney then met with Ms. Tarcon and Dr. Marshall to report their recommendation that Dr. Hoffman's employment be terminated. Dr. Hoffman's employment agreement provided for immediate termination if he committed an act that was grounds for immediate termination under Providence employment policies. He had signed an acknowledgment that he received the policies and understood his obligation to read and abide by them. Among standards contained in the policies was one dealing with "[r]esources" that are "for use in serving patients and for supporting those who serve

10

patients." CP at 281. An example of use of resources identified as inappropriate were "[t]heft or misappropriation of property (including drugs) belonging to the ministry." CP at 281-82. Ms. Gerling and Ms. Kinney considered taking 300 masks from the clinic without authorization to be theft.

According to Ms. Gerling, Ms. Kinney, and Ms. Tarcon, it was Ms. Tarcon and Dr. Marshall who made the decision to terminate Dr. Hoffman's employment. No evidence to the contrary was presented by Dr. Hoffman.

Dr. Hoffman was informed of the decision by Dr. Ravelo, who phoned him and told him his employment was being terminated because he had stolen masks.

*Claims and defenses*

Several months later, Dr. Hoffman sued Providence for employment discrimination, asserting claims for (1) wrongful termination in violation of public policy, (2) disability discrimination, including by failing to reasonably accommodate his disability, and (3) breach of contract. The wrongful termination in violation of public policy claim was based on Dr. Hoffman's allegation that a substantial reason his employment was terminated was because of his February 9 "Reply All" e-mail, which he characterized as "confront[ing his] employer about deficient safety policies that could affect the public." CP at 10. His disability discrimination claims were based on his allegation that he was allergic to Providence's standard masks, that it was a disability, and that while he was initially accommodated, he was discriminated against when the

11

accommodation was withdrawn and he was terminated from employment for exercising it. He asserted that his written contract with Providence had been violated in several ways.

The parties engaged in written and deposition discovery. Over a year later, in January 2022, Providence moved for summary judgment, seeking dismissal of all of Dr. Hoffman's claims. In addition to presenting evidence of the matters recounted above, Providence presented evidence and argument that Dr. Ravelo had not been asked for input on the termination decision, and that individuals involved in recommending and making the decision to discharge Dr. Hoffman had not been aware of his February 9 "Reply All" e-mail.

Dr. Hoffman opposed the motion and filed his own cross motion. In support of both, he submitted a declaration from Pamela Baynes, who had worked alongside Dr. Hoffman for a couple of years before she retired as practice manager of the Valley clinic in August 2016. Ms. Baynes testified that she was aware Dr. Hoffman had allergies. She testified that she was also aware he "had difficulty using the provided mask and needed an alternative," although she could not recall the exact reason why. CP at 349. She recalled that she made small orders of the alternate masks for Dr. Hoffman and "we would keep [them] on an isolated shelf so other people would not use them." *Id.*

Declarations of two nurse practitioners were also submitted in support of Dr. Hoffman's briefing. Dani Fergen, R.N., testified that she had worked alongside Dr.

12

Hoffman for six years, that she "was aware that Dr. Hoffman used specially ordered face masks because he had difficulty with the provided face masks," and testified that he told her he had an allergic reaction to the masks. CP at 352. She said there was a filing cabinet next to Dr. Hoffman's desk where his specially ordered masks were stored. She recalled asking Practice Manager Thorne to order Dr. Hoffman's preferred masks for the entire clinic. (When deposed, Ms. Thorne had similarly testified, although without mentioning Nurse Fergen's involvement, that when Dr. Hoffman complained to her that other people were wearing "his masks," she determined that the masks he preferred cost "just pennies'" more than other masks. She told him, "'If anyone's wearing those masks, they certainly can,'" and told him to let the purchasing nurse know to order more. CP at 241-42.

Dr. Hoffman also relied on a declaration from Katie Kasunick, Nurse Practitioner, who testified that while working alongside Dr. Hoffman for a few years, she never saw him wear the standard mask; he always used an alternative mask. She said he had told her this was because of an allergic reaction to the standard mask. She testified that he would keep the alternative masks near his desk.[3]

---

[3] Nurse Kasunick's declaration contained two other assertions, but they do not meet the criteria for summary judgment evidence, which is required to be made on personal knowledge, set forth specific evidentiary facts, and affirmatively demonstrate the witness's competence to testify to the matters stated. CR 56(e). Nurse Kasunick stated, "The ordering manager, Jo-Ellen Thorne, purchased alternative masks for Dr. Hoffman," but she did not identify a basis for personal knowledge of that matter. CP at

The trial court granted summary judgment dismissal of all of Dr. Hoffman's claims. He appeals.

## ANALYSIS

Dr. Hoffman appeals the dismissal of only his claims for wrongful termination in violation of public policy and disability discrimination.

I.    SUMMARY JUDGMENT STANDARD AND APPELLATE REVIEW

The summary judgment procedure is a means of avoiding the time and expense of an unnecessary trial. *Eakins v. Huber*, 154 Wn. App. 592, 598, 225 P.3d 1041 (2010) (citing *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989)). It is proper when the pleadings, depositions, and admissions in the record, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c). The court views all facts and reasonable inferences in the light most favorable to the nonmoving party; in this case, Dr. Hoffman. *Watness v. City of Seattle*, 16 Wn. App. 2d 297, 305, 481 P.3d 570 (2021). Summary judgment should be granted if a reasonable person could reach but one conclusion from looking at all the facts and evidence. *Johnson v. Recreational Equip., Inc.*, 159 Wn. App. 939, 954, 247 P.3d 18 (2011).

---

356. She stated, "Those alternative masks were clearly for his use and considered for him," *see id.*, but speculation and conclusory statements will not preclude summary judgment. *Strauss v. Premera Blue Cross*, 194 Wn.2d 296, 301, 449 P.3d 640 (2019).

The moving party bears the initial burden of demonstrating there is no genuine dispute as to any material fact. *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). The burden then shifts to the nonmovant to "establish a dispute regarding an element essential to its case." *Byrd v. Sys. Transp., Inc.*, 124 Wn. App. 196, 202, 99 P.3d 394 (2004). To raise an issue of material fact, the nonmovant must do more than rely on bare "conclusory statements of fact," *Snohomish County v. Rugg*, 115 Wn. App. 218, 224, 61 P.3d 1184 (2002), or "allegations made in its pleadings," *Young*, 112 Wn.2d at 225. Instead, responsive evidence must establish specific, admissible facts, drawn from a witness's personal knowledge. CR 56(e). When evidence on material facts conflicts, the case should be submitted to a jury to determine what occurred. *Renz v. Spokane Eye Clinic, PS*, 114 Wn. App. 611, 623-24, 60 P.3d 106 (2002).

We review a trial court's summary judgment decision de novo. *Folsom*, 135 Wn.2d at 663. We can affirm the trial court even if we disagree with the basis on which it grants summary judgment; we may affirm on any basis supported by the record. *Swinehart v. City of Spokane*, 145 Wn. App. 836, 844, 187 P.3d 345 (2008).

II.     DR. HOFFMAN FAILED TO PRESENT EVIDENCE THAT WOULD ESTABLISH A
        RETALIATORY MOTIVE FOR HIS TERMINATION

The Washington Supreme Court adopted the tort of wrongful discharge in violation of public policy in 1984, as a narrow exception to the at-will doctrine. *Martin v. Gonzaga Univ.*, 191 Wn.2d 712, 722-23, 425 P.3d 837 (2018) (citing *Thompson v. St.*

15

*Regis Paper Co.*, 102 Wn.2d 219, 232-33, 685 P.2d 1081 (1984)). *Thompson* held that to

prevail on such a claim, "a plaintiff employee must demonstrate that his or her 'discharge

may have been motivated by reasons that contravene a clear mandate of public policy.'"

*Id.* at 723 (quoting *Thompson*, 102 Wn.2d at 232). If that demonstration is made, "'the

burden shifts to the employer to prove that the dismissal was for reasons other than those

alleged by the employee.'" *Id.* (quoting *Thompson*, 102 Wn.2d at 232-33).

Twelve years after *Thompson*, the Supreme Court observed that the tort of

wrongful discharge in violation of public policy had generally been limited to four

scenarios: "(1) where employees are fired for refusing to commit an illegal act; (2) where

employees are fired for performing a public duty or obligation . . . ; (3) where employees

are fired for exercising a legal right or privilege . . . ; and (4) where employees are fired

in retaliation for reporting employer misconduct, *i.e.*, whistleblowing." *Gardner v.*

*Loomis Armored, Inc.*, 128 Wn.2d 931, 936, 913 P.2d 377 (1996) (citing *Dicomes v.*

*State*, 113 Wn.2d 612, 618, 782 P.2d 1002 (1989)). Dr. Hoffman's complaint alleges that

his employment was terminated because he confronted Providence about shortcomings in

its COVID-19 safety policies, and "[u]ndoubtedly, it is a matter of public policy to

protect staff, patients, and the populace from infection and death during a pandemic."

CP at 10. His lawsuit thus falls into the fourth category—whistleblowing—and is

analyzed under the standard established in *Thompson* and further refined in *Wilmot v.*

16

*Kaiser Aluminum & Chemical Corp.*, 118 Wn.2d 46, 821 P.2d 18 (1991). *See Martin*, 191 Wn.2d at 724.[4]

The applicable standard required Dr. Hoffman to show, first, "that his discharge may have been motivated by reasons that contravene a clear mandate of public policy," and second, "that the public-policy-linked conduct was a significant factor in the decision to discharge the worker," after which "the burden then shifts to the employer to articulate a legitimate nonpretextual nonretaliatory reason for the discharge." *Martin*, 191 Wn.2d at 725-26 (internal quotation marks omitted) (quoting *Thompson*, 102 Wn.2d at 232) (citing *Wilmot*, 118 Wn.2d at 75). The employer's burden is one of production, not persuasion; the burden of persuasion remains at all times with the employee. *Id.* at 726; *Wilmot*, 118 Wn.2d at 68. If the employer articulates such a reason, the burden returns to the plaintiff either to show that the reason is prextextual, or that the public-policy-linked conduct was nevertheless a substantial factor motivating the employer to discharge the worker. *Martin*, 191 Wn.2d at 726. A "substantial factor" need not be the *only* factor

---

[4] Dr. Hoffman's complaint suggested that his claim would be analyzed under a four-element test named after Professor Henry Perritt Jr., who first proposed the test in a 1991 academic treatise. *See* HENRY H. PERRITT JR., WORKPLACE TORTS: RIGHTS AND LIABILITIES (1991). The test was applied in *Gardner*, 128 Wn.2d at 941, but our Supreme Court has since clarified that the Perritt framework does not apply to a claim that falls within one of the four categories of wrongful discharge identified in *Dicomes. Ross v. Anderson Hay & Grain Co.*, 184 Wn.2d 268, 287, 358 P.2d 1139 (2015) (Perritt framework is "unnecessary" to such claims); *accord Martin*, 191 Wn.2d at 723-24; *Karstetter v. King County Corr. Guild*, 193 Wn.2d 672, 686 n.7, 444 P.3d 1185 (2019) (reliance on the Perritt framework in such cases is error).

motivating the discharge because an employer's decision may be based on both legitimate and illegitimate reasons. *Mackey v. Home Depot USA, Inc.*, 12 Wn. App. 2d 557, 572, 459 P.3d 371 (2020) (citing *Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County*, 189 Wn.2d 516, 534, 404 P.3d 464 (2017)).

Providence argued in the trial court and argues on appeal that there are several bases on which Dr. Hoffman's public-policy-related claim fails as a matter of law. It contends he has not identified a clear public policy, which is the basis on which the trial court dismissed the claim. It points out that Dr. Hoffman's own testimony in deposition was that his "Reply All" e-mail was not disagreeing with Ms. Etherton's e-mail but "just adding to it," and providing her with his "thoughts." CP at 67, 85. Finally, it contends that Dr. Hoffman failed to present any evidence from which a jury could find that his "Reply All" e-mail was a factor, let alone a substantial factor, in the decision to terminate him. This last argument is a sufficient basis for dismissing the claim, and the basis on which we affirm.

As Dr. Hoffman points out, because an employer is not apt to announce retaliation as a motive, an employee's prima facie case must ordinarily be shown by circumstantial evidence. *Wilmot*, 118 Wn.2d at 69. "Circumstantial evidence" is evidence from which, based on common sense and experience, jurors may reasonably infer something at issue in a case. 6 WASHINGTON PRACTICE, WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 1.03 (7th ed. 2019). Circumstantial evidence is considered just as reliable as direct

18

evidence. *State v. Miller*, 14 Wn. App. 2d 469, 481, 471 P.3d 927 (2020) (citing *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980)). By way of example, if there was evidence that the decision whether to terminate Dr. Hoffman's employment was entrusted to Dr. Ravelo (there is no such evidence), then even if Dr. Ravelo claimed to fire Dr. Hoffman for a different reason, the allegations that Dr. Ravelo had threatened to "take him down" would be circumstantial evidence of retaliation.

While jurors can rely on reasonable inferences from circumstantial evidence, they cannot engage in speculation or conjecture. *E.g.*, *State v. Buford*, 93 Wn. App. 149, 153, 967 P.2d 548 (1998). Thus, for example, jurors could not be asked to speculate that Mss. Kinney, Gerling, Tarcon, and Dr. Marshall based the employment decision in whole or in part on Dr. Hoffman's "Reply All" e-mail, since there was no evidence they were aware of the e-mail's existence. "'[A]n employer cannot retaliate against an employee for an action of which the employer is unaware.'" *Mackey*, 12 Wn. App. 2d at 576 (alteration in original) (quoting *Cornwell v. Microsoft Corp.*, 192 Wn.2d 403, 414, 430 P.3d 229 (2018)).

Dr. Hoffman contends that evidence that the "Reply All" e-mail "bugged" Ms. Etherton and triggered Dr. Ravelo's alleged threats to "take him down" are sufficient evidence that his termination was retaliatory when considered alongside e-mails and text messages he obtained in discovery. In an e-mail exchange between Ms. Etherton and Ms. Kinney on March 6, after Ms. Kinney notified Ms. Etherton that Dr. Hoffman was going

19

to be placed on administrative leave, Ms. Etherton responded, "Thank you so much for taking care of this in such a timely manner.  i [sic] feel so bad for him what a horrible way to end your career."  CP at 490.  He characterizes Ms. Etherton's reference to "end[ing his] career" as suspicious, because the decision to discharge him had not yet been made.  Yet the inference Dr. Hoffman would have jurors draw—that Ms. Etherton knew of a plan to fire him *for his February 9 e-mail*—is pure speculation.

In the following text message string between Dr. Litchfield and Dr. Ravelo on March 6, after Dr. Litchfield placed Dr. Hoffman on administrative leave, Dr. Hoffman attaches importance to several statements made by Dr. Ravelo.  (The "scuffle with Todd" mentioned at the end of the exchange refers to a telephone call with another doctor that triggered a complaint from Dr. Hoffman in February 2020, but it is unrelated to his legal claims.)  Dr. Ravelo's text messages are on the left; Dr. Litchfield's on the right:

> Can you talk?
> Called and gave Dr. Hoffman advisory that he is On paid administrative leave.  Will make arrangements with Dr. Volk for clinic coverage.

> Oh wow good I offense but I have saved his ass plenty of times.  Who contacted you to put him on administrative leave? I spoke with he they said to hold off

> Kathy and Mike Marshall pulled me in after the meetings today specifically and asked me to do it. I'm fine with that it goes with the job. I think they were directed by Cora.

20

Between you and I rob we . . . rip
to bat for that guy plenty of times.
I want to be present when something
happens.  I no longer feel bad.  I tried
really hard. Cora did not state that to
me so please use caution.

FYI he will claim he has allergies and
that his wife is immunocompromised.
I am hurt by his actions but I no
longer feel bad.  I want to be present
when something happens.

Oh yeah
I think it's unfortunately going to
be pretty messy again.
I didn't feel under those
circumstances that we could go
against their recommendations
however and so I went ahead
and called.  I apologize that I
didn't let you know before I did it.

Ur good.  I feel horrible I wanted
to retire that old guy for ur info

I know I don't dislike him or want
him to go but this ball is rolling.  I
didn't even know the allegation I
just had heard about the scuffle
with Todd.

The scuffle with Todd was
nothing I could of covers that up.
He was caught stealing boxes of
masks.

CP at 404-06 (format modified) (spelling and punctuation in original).  Dr. Hoffman

attaches significance to the statements by Dr. Ravelo that he construes as, "[W]e . . . went

to bat for that guy plenty of times. . . .  I want to be present when something happens. . . .

I no longer feel bad," and, "I wanted to retire that old guy for [yo]ur info." Am. Opening Br. of Appellant at 8.

Even after deposing witnesses and obtaining records of these and other internal communications in discovery, Dr. Hoffman could point to no evidence that Ms. Etherton or Dr. Ravelo were responsible for the decision to terminate his employment, or that they ever provided recommendations or information that was relied on by Ms. Tarcon and Dr. Marshall in making the decision. If the matter had gone to trial, Dr. Hoffman's lawyers could point to no evidence that would support the element—essential to this claim—that a substantial factor in the decision to terminate his employment was retaliation for his February 9 e-mail about COVID-19 readiness. Since a party is not permitted to ask jurors to speculate about something for which he has no evidence, a trial was not required on the wrongful termination in violation of public policy claim.

While that is dispositive of this claim, we note that Dr. Hoffman's briefing periodically segues into immaterial discussion of whether Providence employees consistently labeled his actions as "theft" or "stealing"; whether those terms would be fair if the jury believed he intended to use the masks, over time, on the job;[5] and whether Providence's policies literally forbad taking resources out of one clinic with a view to using them at another clinic. It was *Dr. Hoffman's burden* to prove that retaliation for his

---

[5] Providence's policies identified as an "inappropriate" use of resources, not only "theft," but also "[t]aking ministry . . . property . . . without authorization." CP at 281-82.

February 9 observations about COVID-19 readiness was a substantial factor in his firing, however. Providence had only a limited burden of producing evidence that it had a different reason for firing him; it was not required to defend its decision from all attacks. As federal courts have observed when applying the same burden-shifting approach, "courts 'only require that an employer honestly believed its reason for its actions, even if its reason is "foolish or trivial or even baseless."'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) (quoting *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733 (7th Cir. 2001)).[6] Providence's evidence of the decision made following the H.R. investigation into the mask issue met its burden.

III.    DISCRIMINATION CLAIMS

Dr. Hoffman was likewise unable to demonstrate evidence that justified a trial of his disability discrimination claims.

Washington statutes make it unlawful for an employer to discriminate against any person in terms or conditions of employment because of "the presence of any sensory, mental, or physical disability." RCW 49.60.180(3). "An employer who fails to accommodate an employee's disability faces an accommodation claim, while an employer who discharges an employee for a discriminatory reason faces a disparate

---

[6] The burden-shifting approach applied to the Title VII claims in *Villiarimo* and *Nordstrom* is that from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), which is the same approach Washington applies to wrongful discharge in violation of public policy claims. *Mackey*, 12 Wn. App. 2d at 571 (citing *Martin*, 191 Wn.2d at 725-26).

23

treatment claim." *Becker v. Cashman*, 128 Wn. App. 79, 84, 114 P.3d 1210 (2005)

(citing *Roeber v. Dowty Aerospace Yakima*, 116 Wn. App. 127, 135, 64 P.3d 691 (2003)).

Dr. Hoffman asserted both claims. We address his disparate treatment claim first.

> A.      Disparate treatment: the allegation that Providence terminated
>          Dr. Hoffman's employment because of his allergy

To establish a prima facie case of discharge based on disability, Dr. Hoffman was

required to show that he was (1) disabled, (2) discharged, (3) doing satisfactory work,

and (4) discharged under circumstances that raise a reasonable inference of

discrimination. *See Callahan v. Walla Walla Hous. Auth.*, 126 Wn. App. 812, 819-20,

110 P.3d 782 (2005).

As with his wrongful termination in violation of public policy claim, a burden-

shifting approach is applied. Demonstration by Dr. Hoffman of a prima facie case creates

a rebuttable presumption of discrimination. *Mikkelsen*, 189 Wn.2d at 527. The burden

shifts to Providence, which must articulate a legitimate, nondiscriminatory reason for the

discharge. *Id.* If Providence meets this burden, Dr. Hoffman must produce evidence

sufficient to show that the alleged nondiscriminatory reason was a pretext, and here, too,

it is sufficient if he shows that discrimination based on his disability was a substantial

factor motivating his discharge. *Id.*

Providence contended in the trial court and on appeal that this claim, too, failed for

multiple reasons. It argued that Dr. Hoffman failed to demonstrate that he had a

disability, that he had provided notice of a medical disability to Providence, and that he was discharged under circumstances raising a reasonable inference of discrimination. The last argument is, again, a sufficient basis for dismissing the claim and the basis on which we affirm. We will assume without deciding that Dr. Hoffman had a disability and provided notice.

Even Dr. Hoffman does not believe he was fired because of his allergy to the standard masks. Asked, "[Y]ou think that they—one of the reasons they decided to fire you was because you were allergic to those masks?" he answered, "I would not agree with that statement." CP at 120; *and see* CP at 117-19. His own evidence shows that when he brought his difficulty with the standard masks to the attention of Ms. Baynes, she ordered him a type of mask that did not cause him problems. Staff continued to order the masks that he preferred up to the time his employment was terminated (and presumably even thereafter[7]). There is no evidence he was ever told he could not use his preferred masks. He offers no evidence of any Providence employee stating or behaving in a way that suggests they had a discriminatory animus toward people with allergies. Where Dr. Hoffman lacked any evidence of a discriminatory intent, there was no need for a trial on this claim.

---

[7]As earlier related, witnesses stated that other members of staff preferred the same masks.

25

B.      Reasonable accommodation: the allegation that Providence failed to accommodate Dr. Hoffman's allergy

To establish a prima facie case for failure to accommodate a disability, a plaintiff must show that

> "(1) the employee had a sensory, mental, or physical abnormality that substantially limited his or her ability to perform the job; (2) the employee was qualified to perform the essential functions of the job in question; (3) the employee gave the employer notice of the abnormality and its accompanying substantial limitations; and (4) upon notice, the employer failed to affirmatively adopt measures that were available to the employer and medically necessary to accommodate the abnormality."

*Davis v. Microsoft Corp.*, 149 Wn.2d 521, 532, 70 P.3d 126 (2003) (emphasis omitted) (quoting *Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 193, 23 P.3d 440 (2001), *abrogated by Mikkelsen*, 189 Wn.2d 516).

Employers have an affirmative duty to reasonably accommodate an employee's disability, unless doing so imposes an undue hardship on the employer's business. *Gamble v. City of Seattle*, 6 Wn. App. 2d 883, 889, 431 P.3d 1091 (2018); *Snyder v. Med. Serv. Corp. of E. Wash.*, 145 Wn.2d 233, 239, 35 P.3d 1158 (2001).  Reasonable accommodation envisions an interactive process, "an exchange between employer and employee where each seeks and shares information to achieve the best match between the employee's capabilities and available positions." *Goodman v. Boeing Co.*, 127 Wn.2d 401, 408-09, 899 P.2d 1265 (1995).

To accommodate, the employer must affirmatively take steps to help the disabled employee continue working at their existing position or attempt to find a position compatible with their limitations. *Griffith v. Boise Cascade, Inc.*, 111 Wn. App. 436, 442-43, 45 P.3d 589 (2002) (citing *Doe v. Boeing Co.*, 121 Wn.2d 8, 18, 846 P.2d 531 (1993); *Clarke v. Shoreline Sch. Dist. No. 412*, 106 Wn.2d 102, 120, 720 P.2d 793 (1986)). Washington law "does not require an employer to offer the employee the *precise accommodation he or she requests*." *Griffith*, 111 Wn. App. at 443 (quoting *Sharpe v. Am. Tel. & Tel. Co.*, 66 F.3d 1045, 1050 (9th Cir. 1995)). For an employer to satisfy its legal obligation, it merely needs to show it provided an accommodation, and that the accommodation was reasonable. *Id.*

Where multiple potential modes of accommodation exist, the employer is entitled to select the mode, the employee is not. *Frisino v. Seattle Sch. Dist. No. 1*, 160 Wn. App. 765, 779, 249 P.3d 1044 (2011). If the accommodation the employer provides is reasonable, then the employer has satisfied its legal obligation and the inquiry is over. *Griffith*, 111 Wn. App. at 443.

Dr. Hoffman's reasonable accommodation claim is unique. Providence disputes that Dr. Hoffman's 2016 request for particular masks was presented as one for accommodation of a disability and Dr. Hoffman contends that it was, but what sets this case apart is that Dr. Hoffman admits his disability was initially accommodated: Ms.

27

Baynes ordered his requested masks. *See* CP at 492. He admits that staff continued to order and make available masks that did not trigger an allergic reaction.

Nevertheless, he claims to have demonstrated the essential element that he was later *not* accommodated, "in two ways." CP at 503. He asserts first, that Providence had a duty to "go through a process to withdraw [the] mask accommodation," relying on testimony from Ms. Gerling. *Id.* His second contention is that "after putting Dr. Hoffman on leave . . . [Providence] had a duty to engage in the interactive process before terminating him." *Id.* (citing *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (2000)).

His first attempted proof that Providence failed to accommodate relies on the following deposition testimony from Ms. Gerling:

> Q. . . . Once a reasonable accommodation is in place, can it be taken away?
>
> A. If there's—if there's a change in the, you know, the need for the accommodation, it might be. It might be. It depends on if it's permanent or temporary.
>
> Q. Is there some type of procedure or policy that goes through taking away an accommodation?
>
> A. There is a procedure. So, all of our accommodation requests go through our third-party vendor, Sedgwick, and we have an absence and disability management team at Providence that reviews that with Sedgwick and partners with our business partners.
> So if—you know, if an employee's circumstances changed and they wanted to submit new medical information, they would do that.

CP at 484-85. There is no evidence that the accommodation of ordering Dr. Hoffman's preferred masks and making them available for his use *was* ever taken away.

Dr. Hoffman attempts to demonstrate a material dispute of fact requiring trial with his testimony that Ms. Etherton, Ms. Thorne, and Ms. Baynes all approved of him taking home, or to his car, as many of "his" specially-ordered masks as he desired. That is a disputed fact, to be sure. But it is not material. The fourth and dispositive element of his reasonable accommodation claim is his burden of proving that Providence failed to adopt *any* measure to accommodate his allergy. The undisputed material evidence is that Providence made a reasonable accommodation: it ordered and made available masks, on site, to which he was not allergic. For him to dispute the practice managers' testimony on a different matter does not save his claim.

As for the federal *Barnett* decision on which Dr. Hoffman relies, we note, first, that the opinion was vacated by the United States Supreme Court in *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 122 S. Ct. 1516, 152 L. Ed. 2d 589 (2002). Moreover, the discussion in *Barnett* that Dr. Hoffman cites deals with an issue different from any presented by his case: it deals with the federal Americans with Disabilities Act, and the duty to engage in the interactive process that is "triggered by an employee or an employee's representative giving notice of the employee's disability and the desire for accommodation." *Barnett*, 228 F.3d at 1114. Here, it is undisputed that masks that did not trigger Dr. Hoffman's allergies were ordered as requested and made available to him for four-plus years. *Barnett* is inapposite.

No. 38833-6-III
*Hoffman v. Providence Health & Servs. - Wash.*

In light of undisputed evidence that Dr. Hoffman's alleged allergy was reasonably accommodated after being brought to Providence's attention, no trial is required.

Dismissal of the claims is affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Fearing, C.J.

_____
Staab, J.

30